1 | **COTCHETT, PITRE & McCARTHY, LLP**
2 | JOSEPH W. COTCHETT (#36324)
jcotchett@cpmlegal.com
3 | MARK C. MOLUMPHY (#168009)
mmolumphy@cpmlegal.com
4 | JORDANNA G. THIGPEN (#232642)
jthigpen@cpmlegal.com
5 | MATTHEW K. EDLING (#250940)
medling@cpmlegal.com
6 | 840 Malcolm Road, Suite 200
Burlingame, CA 94010
7 | Telephone: (650) 697-6000
Fax: (650) 697-0577

8 | **MILBERG LLP**
JEFF S. WESTERMAN (#94559)
9 | jwesterman@milberg.com
DAVID E. AZAR (#218319)
10 | dazar@milberg.com
MICHIYO MICHELLE FURUKAWA (#234121)
11 | mfurukawa@milberg.com
300 S. Grand Avenue, Suite 3900
12 | Los Angeles, CA 90071
Telephone: (213) 617-1200
13 | Fax: (213) 617-1975

14 | *Interim Lead Counsel for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE MEDICAL CAPITAL SECURITIES LITIGATION | Case No. SA10-ML-02145 DOC(RBNx) |
| | **CLASS ACTION** |
| This document relates to: | **THIRD AMENDED CONSOLIDATED COMPLAINT FOR BREACH OF CONTRACT** |
| SACV 09-1048 DOC (RNBx) | |
| | **JURY TRIAL DEMANDED** |

**THIRD AMENDED CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    OVERVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    Non-Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    MCH's Business. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Role of the Trustees. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    Solicitation of Investors . . . . . . . . . . . . . . . . . . . . . . . . 15

    D.    Under The Trustees' Watch, MCH Misappropriates
        Investor Funds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        1.    Defendants Paid Medical Capital Millions in
               Undeserved Administrative Fees. . . . . . . . . . . . . . . . . 16

        2.    Defendants Failed To Ensure The Receipt of
               Conforming Documentation Before Paying
               Administrative Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        3.    Defendants' Own Policies Required Them to Review
               and Track Medical Capital's Business Practices. . . . . . 28

        4.    Defendants Improperly and Negligently Relied On
               Inflated Collateral Reports. . . . . . . . . . . . . . . . . . . . . 30

        5.    Defendants Improperly Disbursed Funds for the
               Purchase of Plainly Impermissible Assets. . . . . . . . . . 38

               a.    The Perfect Game, LLC. . . . . . . . . . . . . . . . . . 39

               b.    Viva Vision, Inc. . . . . . . . . . . . . . . . . . . . . . . . 39

               c.    Single Touch Interactive, Inc. . . . . . . . . . . . . . 40

               d.    E Mark. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

               e.    Pyramid Technologies, Inc. . . . . . . . . . . . . . . . 41

               f.    Mail.com Media Corporation. . . . . . . . . . . . . . 41

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

i

**6.     Defendants Knowingly Executed Fraudulent Sales of Receivables Between SPCs**. . . . . . . . . . . . . . . . . . . . . . . 43

**E.     Events of Default**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**F.     The Trustees' Non-Action Following the Events of Default**. . . . 50

**G.     The Trustees Profit From Their Negligence and Bad Faith**. . . . 53

**H.     The Trustees' Liability**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**I.     Damages**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**V.     CLASS ALLEGATIONS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**VI.     CAUSE OF ACTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**FIRST CAUSE OF ACTION (BREACH OF CONTRACT)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**VII.     PRAYER FOR RELIEF**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

**JURY DEMAND**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

This action is related to the action entitled *Securities and Exchange Commission v. Medical Capital Holdings, Inc., et al.*, Case No. SACV-09-0818 (DOC) (RNBx) (the "SEC Action"), pending in this District before the Honorable David Carter.  Pursuant to Section IX of the Court's Preliminary Injunction Order in the SEC Action, Plaintiffs have not included in this Complaint claims against MCH, MCC, its subsidiaries, or its affiliates (collectively referred to as "Medical Capital"), including Sidney Field and Joseph Lampariello, though Plaintiffs reserve their right to seek leave from the Court to amend the Complaint to add such claims.

Based on the limited amount of discovery received from Defendants to date, documents reveal that Medical Capital suffered from systemic problems almost from its inception as a company.  Documents further reveal that the Defendants disregarded their own policies and explicit provisions of the Note Issuance and Security Agreements ("NISAs") that were designed to protect investors such as Plaintiffs.  Plaintiffs anticipate further corroborating details.  Therefore, Plaintiffs allege upon information and belief based, *inter alia*, upon investigation conducted by Plaintiffs and their counsel, except as to those allegations pertaining to Plaintiffs personally, which are alleged upon knowledge.

## I. OVERVIEW

1.   This action arises from a massive breach of trust by those specifically charged with representing and protecting the interests of Plaintiffs and other investors in Medical Capital Holdings, Inc. ("MCH").

2.   Plaintiffs bring this action against defendants Wells Fargo Bank, National Association ("Wells Fargo") and The Bank of New York Mellon Corporation ("BNYM") on behalf of a Class of persons and entities who purchased interests in notes issued by Medical Provider Funding Corporation II ("MP II"), Medical Provider Funding Corporation III ("MP III"), Medical Provider

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

1

Funding Corporation IV ("MP IV"), Medical Provider Funding Corporation V ("MP V"), and Medical Provider Funding Corporation VI ("MP VI") and suffered damages (the "Class").

3.     MCH, based in Tustin, California, is a medical receivable financing company that makes money by purchasing accounts receivable from healthcare providers at a discount and collecting the debts owed.  MCH operates through its wholly owned subsidiary, Medical Capital Corporation ("MCC").  MCH and MCC are run by Sidney Field ("Field"), the CEO, and Joseph Lampariello ("Lampariello"), the President and COO.

4.     Since 2003, MCH raised over $2.2 billion from an estimated 20,000 investors, including plaintiffs and other Class members, supposedly to fund its operations.  The money was raised through the offering of notes issued by five Special Purpose Corporations ("SPCs") created by MCH: MP II, MP III, MP IV, MP V, and MP VI.

5.     According to Private Placement Memorandum ("PPMs") prepared for each SPC, investor funds within each SPC were to be carefully segregated and used to pay for accounts receivable from medical providers.  The PPMs further assured that investor funds would not be used to pay administrative fees to MCH and its affiliates.

6.     Critically, to ensure these promises were kept, investors were told that MCH had retained two prominent banks – defendants Wells Fargo and BNYM – to serve as Trustees of the SPCs and to represent the interests of investors.  For their work, the Trustees were paid substantial fees and given the opportunity to act as a lender to each SPC and to invest the funds in their own mutual funds, repurchase agreements with investment banks, and other investment vehicles.  Unfortunately, under the supposedly watchful eyes of the Trustees, MCH was a scam.

**THIRD AMENDED CONSOLIDATED COMPLAINT**

7.     As now revealed in a pending SEC enforcement action, in reports issued by the Court-appointed Receiver, and in correspondence from the Trustees to investors, MCH, MCC, Fields and Lampariello – for years – used the Trustee-controlled accounts as their personal piggy banks, improperly requesting and obtaining investor funds to pay themselves massive "administrative fees" of nearly $325 million which they used to purchase lavish personal perquisites including a multi-million dollar, 118-foot yacht.

8.     MCH and its affiliates also invested in an array of non-medical projects that were placed under the personal supervision of Lampariello, including mobile phone and movie ventures, and commingled investor funds between the various SPCs, all in violation of the PPMs issued to investors.

9.     The SEC and Receiver further found that MCH and its affiliates, despite controlling hundreds of millions of dollars, operated without financial or accounting controls, failed to prepare financial statements in accordance with GAAP, failed to perform annual appraisals of assets, and repeatedly obtained the Trustees' permission to pay themselves fees based on a formula that blatantly violated the PPMs' mandate that fees not come from investor funds.  The Trustees, over and over again, without exception, willingly and recklessly signed off on the requests, even though these requests were (1) unsupported by documentation required under the NISAs; and (2) fraudulent on their face, and certainly discoverable in any event by trustees that were adequately performing their duties.

10.     All five SPCs are now in default to investors, failing to make interest and principal payments on almost $1 billion worth of notes.  Based on his review of internal records, and interviews with company employees, the Receiver recently reported to the Court that of approximately $625 million of medical accounts receivable on the SPCs' collective books, just $80 million is verifiable, and the remaining accounts – totaling $542 million – "no longer exist."  Undoubtedly, the

---

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

3

1  Noteholders – Class members herein – will suffer substantial losses.  By this

2  action, Plaintiffs seek to recover damages for such losses.

## II.JURISDICTION AND VENUE

4      11.     The Court has jurisdiction over this action pursuant to 28 U.S.C.

5  §§ 1332(d) and 1367(a).  The amount in controversy exceeds $5,000,000,

6  exclusive of interest and costs, and there is diversity of citizenship between

7  Plaintiffs and each of the Defendants.

8      12.     Venue is proper in this district.  MCH and MCC, which operated the

9  SPCs, were also headquartered in this District.  The related SEC Action is pending

10  in this District.  Defendants maintained offices in this District.  A substantial part

11  of the events, acts, omissions and transactions complained of herein occurred in

12  this District.  At all relevant times herein, defendant conducted substantial

13  business and/or committed violations of United States law by acts committed in

14  this District.

## III. PARTIES

**A.      Plaintiffs**

17      13.     Plaintiff **Steven J. Masonek** is an individual and resident of Butte

18  County, California.  Plaintiff Steven J. Masonek is married to Plaintiff Sandra J.

19  Masonek.  Between 2005 and 2008, plaintiff invested approximately $949,000 to

20  purchase an interest in notes either held individually, together with Sandra J.

21  Masonek, or through the Steven J. & Sandra J. Masonek Trust, in MP II, IV and

22  V.  The notes are now in default and, as a result, plaintiff has been damaged.

23      14.     Plaintiff **Sandra J. Masonek** is an individual and resident of Butte

24  County, California.  Between 2005 and 2007, plaintiff invested approximately

25  $749,000 to purchase an interest in notes either held together with Steven

26  Masonek, together with Robert B. Price, or through the Steven J. & Sandra J.

27

28

LAW OFFICES
Cotchett,
Pitre &
McCarthy, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

4

Masonek Trust, in MP II and IV.  The notes are now in default and, as a result, plaintiff has been damaged.

15.     Plaintiff **Robert B. Price** is an individual and resident of Kings County, New York.  In May 2005, plaintiff invested approximately $270,000 to purchase an interest in a note held together with Plaintiff Sandra J. Masonek in MP II.  The note is now in default and, as a result, plaintiff has been damaged.

16.     Plaintiffs **Mary Zahara** and **Mark Masonek** are individuals and residents of Butte County, California.  Plaintiffs Mary Zahara and Mark Masonek are married.  In 2007, plaintiffs invested approximately $330,000 to purchase an interest in notes either held together or through The Zahara Family Trust Dated 4-1-91 in MP IV.  The notes are now in default and, as a result, plaintiffs have been damaged.

17.     Plaintiff **Joann Hosking** is an individual and resident of Butte County, California.  Between 2004 and 2007, plaintiff invested approximately $1,375,000 to purchase an interest in notes either held individually or through the Ray A. & Joann Hosking Living Trust in MP II, III and IV.  The notes are now in default and, as a result, plaintiff has been damaged.

18.     Plaintiff **Cynthia Masonek Swanson** is an individual and resident of Butte County, California.  In May 2007, plaintiff invested approximately $50,000 to purchase an interest in a note in MP II.  The note is now in default and, as a result, plaintiff has been damaged.

19.     Plaintiff **Robert H. Ludlow, Jr., on behalf of the Robert H. Ludlow, Jr. Revocable Trust 1999** is an individual and resident of Santa Cruz County, California.  In January 2008, plaintiff invested approximately $100,000 to purchase an interest in a note in MP V.  The note is now in default and, as a result, plaintiff has been damaged.

20.     Plaintiff **Peter Braunstein** and **Ann Braunstein** are individuals and residents of Marin County, California.  Plaintiffs Peter and Ann Braunstein are married.  Between 2006 and 2008, plaintiffs invested approximately $450,000 to purchase an interest in notes either held together or through Peter Braunstein's IRA accounts in MP III, IV and V.  The notes are now in default and, as a result, plaintiffs have been damaged.

21.     Plaintiff **Michel Rapoport** is an individual and resident of Sarasota, Florida.  In February 2007, plaintiff invested $3,000,000 to purchase an interest in MP IV.  The note is now in default and, as a result, plaintiff has been damaged.

22.     Plaintiff **Kathleen Darrow** is an individual and resident of Glenn County, California.  From 2008-2009, plaintiff invested approximately $650,000 to purchase interests in notes in MP VI.  The notes are now in default and, as a result, plaintiff has been damaged.

**B.     Defendants**

23.     Defendant **Wells Fargo Bank, National Association** ("Wells Fargo") has its principal executive offices located in Minneapolis, Minnesota, and other affiliate offices in San Francisco and Los Angeles, California.  Wells Fargo promotes itself as providing corporate trust services, including "fiduciary and agency products," since 1934.

24.     Defendant **The Bank of New York Mellon** ("BNYM") is a subsidiary of The Bank of New York Mellon Corporation, a Delaware corporation.  BNYM's principal executive offices are located in New York, New York, and it maintains other affiliate offices in Los Angeles, California.  BNYM promotes itself as the "world's leading provider of corporate trust and agency services."

25.     Defendants Wells Fargo and BNYM are collectively referred to herein as the "Trustees" or the "Defendants."

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

6

26.     Except as described herein, Plaintiffs are ignorant of the true names of defendants sued as Does 1 through 10 inclusive and, therefore, sue these defendants by such fictitious names.  Plaintiffs will seek leave of the Court to amend this Complaint to allege their true names and capacities when they are ascertained.  Plaintiffs allege that each of these Doe Defendants is responsible in some manner for the acts and occurrences alleged herein, and that Plaintiffs' damages were caused by such Doe Defendants.

27.     Defendant, and the Doe Defendants, and each of them, are individually sued as participants, co-conspirators, and aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

## C.     Non-Parties

28.     Plaintiffs are aware of various non-parties that participated in the wrongdoing alleged herein.  Many of these persons and entities, including some described below, have been named in the SEC's related complaint and/or included in the Court's Permanent Injunction Order which presently precludes noteholder investors from bringing legal claims against designated parties, including affiliates of MCH and MCC.  Plaintiffs reserve their right to seek leave from the Court to amend their Complaint to add such non-parties at a future date, once the bar order is lifted.

29.     **Medical Capital Holdings, Inc.** ("MCH") is a Nevada corporation with its principal place of business in Tustin, California.  Through various wholly-owned operating subsidiaries and SPCs, MCH provides financing to healthcare providers by purchasing their accounts receivables and making secured loans to them.  MCH uses the SPCs to raise money from investors to fund the financing.  MCH uses the operating subsidiaries to underwrite, monitor, administer, and service these financings.  In February 2001, the California Department of

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

7

Corporations issued a Desist and Refrain Order against MCH from the further offer or sale of securities in the State of California.

30.     **Medical Capital Corporation** ("MCC") is a Nevada corporation and wholly owned subsidiary of MCH, with its principal place of business in Tustin, California.  MCC is the administrator for each of MCH's SPCs, including MP II, III, IV, V and VI, and provides management, underwriting, and administrative services, such as bookkeeping, payroll, and accounting services, including administration of all investor promissory notes and interest payments.  The directors of MCC are Field and Lampariello, as well as Lawrence J. Edwards. Field serves as MCC's CEO and Lampariello serves as MCC's President and COO.  Other key employees of MCC include Alan Meister (Treasure and Chief Financial Officer) and Thomas Fazio (General Counsel).  MCC's primary source of revenue was the Administrative Fees paid through various SPCs.

31.     **Medical Tracking Services, Inc.** ("MTS") is a wholly owned subsidiary of MCH.  MTS is a Nevada Corporation.  MTS provided data entry of receivables and receivable payments for the SPCs.  When the SPCs received batches of receivables under receivable purchase agreements, claim information was directly uploaded from the provider to MTS, supposedly to audit the information and input the data into customized tracking software.  As receivable payments came in from insurance companies, MTS would enter data on the payments into the tracking programs.  MTS would then generate and provide reports to MCC and the SPCs on receivable collections.

32.     **Sidney M. Field** is a resident of Villa Park, California.  Field was the CEO and director of MCH and its affiliates during the relevant period.  Just before forming MCH, Field held an insurance license and owned FGS Insurance Agency, an Irvine-based auto insurer.  According to California Department of Insurance lawsuits, in <u>February 1987</u>, Field and others arranged for Coastal

Insurance Inc., which they controlled, to pay Field $17.5 million for FGS. Two years later, just before it slipped into insolvency, Coastal sold FGS back to Field for $206,000. California Insurance regulators called the deal a "sham transaction" that diverted cash from an ailing insurer to Field. Field's insurance license was revoked. Regulators also warned Field and Coastal that they would not license FGS if Field remained involved. Despite that warning, Field allegedly continued to control FGS and to serve as a "de facto" director of Coastal. Under Field's supervision, FGS agents allegedly used a deceptive practice called "sliming" to sell auto policies, altering the accident records of questionable drivers and falsifying information about car values and commute mileage so applicants could qualify for insurance. FGS also allegedly duped customers into paying interest rates of 21-40% when they financed their premiums. The Department of Insurance sued Field for civil racketeering in August 1990 and again three years later, this time for fraud, after he filed bankruptcy. Ultimately, FGS' license was revoked and the Company was liquidated by a bankruptcy trustee.

33.   **Joseph J. Lampariello** resides in Newport Beach, California. Lampariello was the president, COO, and director of MCH and its affiliates during the relevant period. Like Field, Lampariello is a defendant in the pending SEC enforcement action.

34.   **Medical Provider Financial Corporation II** ("MP II") is a Nevada corporation and wholly-owned SPC of MCH that was formed in October 2003. From January 2004 to December 2005, MP II conducted two series of note offerings, raising approximately $251.7 million through the issuance of 3,458 notes to investors. As of recently, MP II had $88 million in outstanding notes and defaulted in paying $43 million in principal and $1.3 million in interest to its investors. After original trustee Zions First National Bank resigned in 2005, BNYM took over as Trustee for MP II.

**THIRD AMENDED CONSOLIDATED COMPLAINT**

35.   **Medical Provider Financial Corporation III** ("MP III") is a Nevada corporation and wholly-owned SPC of MCH that was formed in February 2005. From July 2005 to January 2008, MP III conducted two series of note offerings, raising a total of about $552 million by issuing 5,318 notes to investors.  MP III had $109.4 million in outstanding notes, and as of May 2009, MP III had defaulted in paying principal on $26.5 million in outstanding notes.  Wells Fargo served as Trustee for MP III.

36.   **Medical Provider Financial Corporation IV** ("MP IV") is a Nevada corporation and wholly-owned SPC of MCH that was formed in July 2005 and commenced operations in October 2006.  From November 2006 through February 2008, MP IV conducted two series of note offerings, raising a total of $401.3 million by issuing 4,222 notes to investors.  As of May 2009, MP IV had $400 million in outstanding notes and defaulted in interest payments in January 2009 and since March 2009.  BNYM served as Trustee for MP IV.

37.   **Medical Provider Funding Corporation V** ("MP V") is a Nevada corporation and wholly-owned SPC of MCH that was formed in September 2007. From November 2007 to about July 2008, MP V conducted a note offering, raising $401.8 million by issuing 4,323 notes that begin to mature in November 2009.  As of March 31, 2009, MP V had $401.1 million in outstanding notes issued to 4,270 investors.  MP V recently failed to pay interest to investors and is in default of the notes.  Wells Fargo served as Trustee for MP V.

38.   **Medical Provider Funding Corporation VI** is a Nevada corporation and wholly-owned SPC of MCH that was formed in April 2008.  From August 2008 to the present, MP VI has conducted a note offering and, as of June 19, 2009, it had raised $76.9 million through the issuance of notes to about 700 investors. MP VI recently failed to pay interest to investors and is in default of the notes. BNYM served as Trustee for MP VI.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

# IV. STATEMENT OF FACTS

## A.     MCH's Business

39.     MCH provides financing to healthcare providers by purchasing their accounts receivables at a discount and making secured loans to them.  The business is managed through its chief operating company, MCC, a wholly owned subsidiary of MCH.  MCC served as the Administrator for each SPC pursuant to an Administrative Services Agreement.  MTS served as the Servicer for each SPC pursuant to a Master Servicing Agreement.

40.     MCC and MTS performed several functions of the SPCs, including (a) negotiating, executing and issuing promissory notes, (b) identifying and evaluating potential receivable purchase transactions, loans and other investments, (c) producing reports and statements to the Trustees for the release of monies for the funding of receivable purchases, loans and other investments, (d) handling healthcare provider and noteholder relations, (e) processing receivable payments and other loan investment payments through lockbox accounts to the Trustees, and (f) providing periodic reports to the Trustees.

## B.     Role of the Trustees

41.     Medical Capital could not have enjoyed the "success" it did – raising approximately $2.2 billion dollars from over 20,000 investors, over $1 billion of which is still due and owed to Noteholders – without Wells Fargo and BNYM, both prominent financial institutions, lending their names as trustees.

42.     Medical Capital's ability to successfully market the Notes to Plaintiffs and the other Noteholders thus depended in large part on the appearance of safety and trust provided by Defendants as trustees on the Notes – as they themselves acknowledge.  For example, Defendants' own marketing materials tout how, in their role as trustee, they serve to protect Noteholders' interests:

- According to Defendant BNYM, "[t]he trustee's job [is] to act in a fiduciary capacity on behalf of the bondholder and facilitate payments to the same."

- Defendant BNYM also touts that among the benefits it provides to investors, "Investor's interests [are] represented by The Bank of New York Mellon as independent third party [to] ensure interests of noteholders are protected."

- According to Wells Fargo, "[a]s trustee, we protect the interests of the bondholders and investors by monitoring compliance with governing deal documentation."

43.   Defendants Wells Fargo and BNYM entered into Note Issuance and Security Agreements ("NISAs") for each of the SPCs.  Pursuant to the NISAs, which were substantially similar for each SPC, Wells Fargo and BNYM expressly agreed to act "as trustees for the noteholders" and to "accept the trusts," thereby assuming fiduciary duties to protect the Noteholders' interests.

44.   Pursuant to the NISAs, each series of notes issued by the SPCs was supposed to be secured by its own set of assets, including specific receivables and all collections relating to the receivables.  MCC and MTS, after collecting amounts related to the receivables, were then required to transfer the funds to the Trustees for deposit in the respective trust accounts.

45.   To ensure adequate segregation and accounting of investor funds, each Trustee was obligated to maintain a separate trust account for each series of notes for the benefit of the Noteholders of that series of notes.  Amounts relating to collateral or proceeds of collateral for a series of notes were to be deposited into the appropriate trust account.  Once funds were deposited into the trust accounts, they were under the exclusive control of the Trustees.  Neither MCC, MTS, or any of the SPCs had authority to make distributions from the funds in the trust

accounts.  Rather, the Trustee had the exclusive authority to make distributions, only after receipt of required documentation from the various Medical Capital entities, consistent with representations made to Noteholders in the PPMs and the terms of the NISAs.

46.    The NISAs required that, before any collateral was sold, transferred or otherwise disposed of by Medical Capital, the Trustees received a written statement of the gross proceeds to be derived from the sale and the person to which the collateral was to be sold or transferred to.  Non-receivable assets were to be evidenced by a promissory note and/or other instruments.  The Trustees also were required to receive a schedule of all collateral pledged on assets and all related UCC-1 financing statements.

47.    The NISAs established a priority of payments: first, to pay trustee fees, then to pay Noteholders principal and interest, and only then, when appropriate, for administrative fees.  The Trustees were not permitted to make disbursements for administrative fees without certifying that all conditions had been satisfied and, even then, could not pay fees from investor funds.

48.    Pursuant to the NISA and Administrative Services Agreements, MCC could request payment of an Administrative Fee by providing a written certification by the SPC (prepared by MCC as Administrator) to the Trustee.  The certification included the calculation of the Net Collateral Coverage Ratio, which was supposed to be derived by adding together the value of all cash, eligible receivables and collateral, then dividing that number by the amounts payable under the NISA and Notes issued thereunder (principal due at maturity and interest then due to Noteholders).

49.    In valuing collateral, accounts receivable were <u>only</u> "eligible" to be included if they were purchased within 180 days of the date the claim was submitted to an "approved payor," as defined.  Additionally, loans made by SPCs

had to be valued using the lesser of the principal and interest due from the borrower or the value of the property securing them. If the Net Collateral Coverage Ratio was greater than 100% (i.e., the stated value of the assets exceeded the current liabilities), MCC took the position with the Trustee that it could request an Administrative Fee in an amount up to the entire balance in the account above and beyond that necessary to maintain the 100% ratio.

50.    According to its agreements and disclosures, the SPCs (through MCC as administrator) were to have all real and personal property securing loans and investments appraised at least once a year by an independent appraiser, and provide an annual certification to the Trustees of the value. The SPC was also required to certify each year that the valuations had been completed. Each certification of the Net Collateral Coverage Ratio was to be based on the most recent valuations. Thus, MCC was only entitled to an Administrative Fee if, based on recent independent valuations, the Net Collateral Ratio was at least 100%, and only if such fees could be payable from valid and collected accounts receivable.

51.    To further assure the legitimacy of the operations and valuation of collateral, the Trustees had the right to ask for whatever instruments or documents they wanted from the Debtor – so long as it was a "reasonable" request – and the Debtor was required to promptly deliver such information.

52.    The NISAs stated that the provisions were governed by California law or New York law. Under California and New York law, corporate trustees act as fiduciaries and are held to the highest standard of care and loyalty with regard to the duties of prudence, loyalty, avoidance of conflict of interest with trust beneficiaries, and avoidances of self-dealing in their administration of trusts, including but not limited to the duties set forth in the California Probate Code. Importantly, <u>nothing</u> in the NISAs abrogated Defendants' obligations to comply with applicable Probate Code sections.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

14

53.    Based on all the above, the Trustees represented the Noteholders' last line of defense and protection against misuse of their funds, particularly since the SPCs had no employees or offices of their own.  Indeed, the Trustees would later tout their roles as "[t]he role of the Trustee is to protect the interest of the Series II Noteholders.  The Trustee is not related to MedCap IV or Medical Capital Corporation, and therefore will exercise independent judgment in fulfilling its responsibilities."  *See* **Exh. 1**, attached hereto.  The Trustees also had the benefit of experience serving as trustees of similar investment vehicles created by other medical receivable companies, with notice of the unique risks to investor funds used to fund such operations.

## C.    Solicitation of Investors

54.    MCH funded its operations by offering promissory notes issued by its SPCs to investors.  Since December 2003, MCH raised approximately $2.2 billion from over 20,000 investors.

55.    The notes were sold as private placements pursuant to Private Placement Memoranda ("PPMs") explaining the transactions.  The PPMs described the terms of the notes, the nature of and limitations on the loans and investments that will be made with the proceeds, and the policies and procedures for the payment of fees.  The SPCs sold notes with various maturities (one to seven years) and interest rates (8.5% to 10.5%).  Importantly, the SPCs represented that, after paying offering expenses of 4% to 8%, they would use the net offering proceeds to purchase healthcare receivables and make investments in other healthcare-related businesses.

56.    The SPCs also touted to investors the important role of independent and prominent "trustees" – Wells Fargo and BNYM – which were charged with representing the interests of Noteholders, communicating with MCH and MCC, receiving reports, maintaining noteholder funds used to make investments, and

**THIRD AMENDED CONSOLIDATED COMPLAINT**

releasing funds to the SPCs for appropriate and permitted purposes, including payment of interest and principal to Noteholders and payment of appropriate fees.

57.   Defendant BNYM served as the Trustee for MP I, II, IV and VI. Defendant Wells Fargo served as the Trustee for MP III and V.

**D.   Under The Trustees' Watch, MCH Misappropriates Investor Funds**

**1.   Defendants Paid Medical Capital Millions in Undeserved Administrative Fees**

58.   On <u>July 16, 2009</u>, the SEC commenced an enforcement action against MCH, MCC, MP VI, Field and Lampariello ("SEC Defendants"), and detailed various violations of securities laws based on months-long investigation of MCH and its affiliated entities, including the overpayment of unauthorized administrative fees from accounts controlled by the Trustee BNYM.

59.   As described in the complaint filed in the SEC Action (*S.E.C. v. Medical Capital Holdings, Inc., et al.*, Case No. SACV 09-0818 DOC (RNBx), Dkt. No. 111) ("SEC Complaint"), while MCC was entitled to a fee for its services, the PPMs highlighted, under the heading "Restrictions on Use of Proceeds," that the SPCs would <u>not</u> use "any proceeds from the sales of notes to pay administrative fees to [MCC] for the services it provides as administrator" and that such fees would rather be "paid out of amounts collected from the accounts receivables and proceeds from other investments." The PPMs further represented that the SPCs believed that the administrative fees paid to MCC would be "no greater than those an independent third-party would charge for providing similar services."

60.   MCH and MCC did not use offering proceeds as represented in the PPMs and, instead, misappropriated a substantial amount of the investors' funds to pay administrative fees to MCC. Indeed, according to the SEC's complaint, as of <u>June 19, 2009</u>, MP VI's <u>administrative fees exceeded its collections</u> by

**THIRD AMENDED CONSOLIDATED COMPLAINT**

16

approximately $20.4 million, in direct contravention to its PPMs' representations that administrative fees would solely be "paid out of amounts collected from the accounts receivable and proceeds from other investments." These fees were distributed by the Trustee – BNYM – from investor funds, even though lockbox collections from medical accounts receivable plainly were insufficient to justify any such payments.

61.    According to the SEC, in a May 27, 2009 Supplemental PPM, MCH and MCC further misrepresented that, "As of February 28, 2009, we have issued notes in the face amount of $69,331,558.90.  We have used $65,558,703.02 of the proceeds to finance accounts receivable.  We have applied $3,264,410.12 to commissions and other expenses.  The balance is on deposit in our trust account awaiting additional accounts receivable financing."  In fact, as of February 28, 2009, MCH and MCC had paid $21.7 million in administrative fees, which exceeded MP VI's collections by $18.6 million.  In addition, according to the SEC, MCH and MCC actually spent approximately $48.8 million on receivables, rather than the $65.5 million represented in the Supplemental PPM.  All told, MCH and MCC took approximately 24% of the amount raised as administrative fees, far in excess of the collections on receivables, in MP VI.

62.    After the SEC Action was filed, the Court appointed a Receiver to review the records of MCH and its affiliates.  The Receiver traveled to the MCC premises in Tustin, secured the premises and called a meeting of all MCC employees.  The Receiver and his counsel then took several steps to investigate and secure the assets of the SPCs, including (1) interviewing former MCC employees and counsel (Fazio and various outside counsel) regarding the operations and assets of the SPCs, pending litigation and transactions, and the flow of funds into and out of the companies; and (2) locating and reviewing

company documents pertaining to key non-receivable assets, pending litigation
and various transactions.

63.     As a result of his investigation, the Receiver has filed reports with the
Court, including a Nineteenth Report recently filed on February 10, 2011,
confirming many of the SEC's original allegations regarding MP VI, as well as a
much wider-scope of improprieties affecting MP II, III, IV and V, which had
virtually identical restrictions on administrative fees.

64.     According to the Receiver, MCC collected Administrator Fees in the
amount of $324.549 million from the various SPCs:

| | |
|---|---|
| MP I | 91,030,000 |
| MP II | 55,659,000 |
| MP III | 48,650,000 |
| MP IV | 56,565,000 |
| MP V | 48,030,000 |
| MP VI | 24,615,000 |
| **Total** | **$324,549,000** |

The Receiver further prepared a breakdown of the Administrative Fees paid by
year, revealing that the vast majority of fees were paid at the beginning of each
SPC's existence and well before significant medical accounts receivables had been
collected by the respective SPC.  Thus, just as with MP VI described in the SEC
Complaint, it appears that the Trustees allowed other SPCs to pay exorbitant
administrative fees from investor funds, not from accounts receivable collections.
These fees were paid even though it was readily apparent that such payments
exceeded amounts paid into lockbox accounts used to collect accounts receivable
and were thus, facially improper.  In the SEC Action filings, Field and Lampariello
acknowledge that fees were "specifically approved by the financial institution
trustees" – i.e., Defendants.

65.     Defendants repeatedly disbursed payments for administrative fees from investor funds despite knowing that the SPCs had not collected sufficient proceeds from receivables and other investments to cover the requested fees. Defendants knew precisely how much money had been collected on each SPC's receivables and other investments at any given time because, under § 5.08(b) of the Agreements, the funds in each SPC's Lockbox Account (which represented recent collections on receivables and other investments) were transferred to the Trustees at the end of each business day for deposit in the SPCs' respective trust accounts.  Thus, at all times during the existence of the SPCs, Defendants were fully aware of the total amount of money that each SPC had collected from receivables and other investments to date, and Defendants knew that MCC's requests for administrative fees were improper because each of the SPCs' collections to date were insufficient to pay such fees.

66.     For example, according to the SEC, one of the SPCs, MP VI (which had only started to raise investor funds in August 2008), had only collected $4.6 million from receivables and other investments as of June 19, 2009.  Nevertheless, defendant BNYM approved payments of $25 million in administrative fees to MCC, or $20.4 million more than what MP VI had actually collected by that point.

67.     Because the funds in the Lockbox Account for MP VI were transferred to BNYM at the end of each business day, BNYM was well aware that MP VI's collections from receivables and other investments were grossly insufficient to pay the requested administrative fees, and if BNYM was to pay the requested fees, the money would have to come from investor funds.  As discussed above, the Receiver's investigation confirms the SEC's allegations concerning MP VI, and shows that the same impropriety was occurring in each SPC.

68.     According to the Receiver's analysis, the vast majority of these administrative fees were requested, and approved and disbursed by Defendants, at

**THIRD AMENDED CONSOLIDATED COMPLAINT**

the beginning of each SPC's existence and well before the SPCs had collected significant amounts of receivables.  For example, although MP VI had only started to raise investor funds and purchase receivables in <u>August 2008</u>, by <u>December 31, 2008</u> – only four months later – BNYM had approved the payment of $18.4 million in administrative fees to MCC.  Defendant BNYM knew that MP VI had not been operating for a sufficient period of time to collect the $18.4 million that was paid out to MCC as administrative fees; indeed, as discussed above, BNYM knew exactly how much MP VI had collected at that point in time from its knowledge of the amounts that were transferred from lockbox accounts to the MP VI trust account held by BNYM.  Accordingly, BNYM knew that MCC's representations in support of its requests for fees from MP VI were false, and that, if approved, a significant portion of the requested fees would have to come from investor funds.  But despite that knowledge, BNYM approved MCC's requests and paid the requested fees.

69.     Similarly, although the note offering for MP V (and, therefore, MP V's purchase of receivables and other investments) had only just started in <u>November 2007</u>, Defendant Wells Fargo paid a total of $6.35 million in administrative fees to MCC by the end of <u>2007</u>.  Wells Fargo knew that two months was an insufficient amount of time for MP V to collect $6.35 million from receivables and other assets, and, in fact, Wells Fargo knew exactly how much money MP V had collected by the end of <u>2007</u> from its knowledge of transfers from lockbox accounts to the MP V trust account held by Wells Fargo.  Accordingly, Wells Fargo knew that MCC's representations in support of its requests for fees from MP V were false, and that a significant portion of the requested fees had to come from investor funds.  Despite that knowledge, Wells Fargo approved MCC's requests and paid the requested fees.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

70.   Because Defendants knew how much each SPC had collected in receivables at any given point in time, based on the transfers from the lockbox accounts to the trust accounts each business day, Defendants knew full well that collections of receivables were insufficient to fund the payments of the requested fees, so that the fees could have only been paid from investor funds.  Defendants paid out an egregious sum of $324 million in administrative fees to MCC, and those fee requests were nevertheless always approved by Defendants without question.

71.   Defendants did not need to undertake any investigation, or seek further information from MCC or MCH beyond that which Defendants already possessed, in order to determine that MCC's representations in its requests for fees were false, and the payment of those fees was therefore improper.  Instead, Defendants already knew – from the Lockbox Account transfers to Defendants that occurred each business day – that the SPCs had not collected sufficient receivables from which the requested fees could be paid.  Defendants should have refused to pay those fees from investor funds based on knowledge they already possessed, even without further investigation into the falsity of MCC's representations.

**2.   Defendants Failed To Ensure The Receipt of Conforming Documentation Before Paying Administrative Fees**

72.   As described above, Medical Capital was purportedly in the business of purchasing medical receivables and certain conforming healthcare-related assets.  The NISAs provided for two types of receivables: Eligible Receivables, as defined, and other receivables purchased from Receivable Sellers.  Further, the NISAs provided for the purchase of "Non-Receivable Assets."  To protect Noteholders and the trust monies, the NISAs strictly defined and regulated transactions associated with any expenditure of funds.  The defined terms required

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

21

the production of substantial documents from the SPCs in order to validate that funds were being used for the proper purposes. Those documents included, but were not limited to, certificates, special forms, opinions of counsel, annual and quarterly reports, UCC filings, copies of promissory notes and other agreements, NCCR Reports, compliance reports for MCC and MCH, valuation certificates, statements, and other documents.

73.     Despite these clear mandates, Defendants breached their duties under the NISAs in at least three ways: (1) by failing to ensure documents conformed to the requirements of the NISAs; (2) by failing entirely to ensure receipt of documents; and (3) by simply ignoring patently obvious flaws and mistakes in the documents.

74.     **Approved Payors:** The NISAs required certificates to be provided to the Trustee that identified "Approved Payors," as defined. On information and belief, each Defendant failed to ensure that these certificates were provided as required. Approved Payors are particularly important because only receivables owed by Approved Payors are considered Eligible Receivables, as defined. As described below, Eligible Receivables are included in the calculation of the NCCR. Therefore, Approved Payors are the foundation of the entire system – and the failure to obtain proper documentation of Approved Payors renders all other reports and calculations worthless. Defendant Wells Fargo's document production reveals that Wells Fargo did not even maintain a list of Approved Payors or supporting certificates or other documentation. On information and belief, nor did Defendant BNYM.

75.     **Non-Receivable Assets:** Defendants also failed to obtain proper forms and certificates related to Non-Receivable Assets. Medical Capital's business was supposed to involve the purchase of healthcare receivables. Nonetheless, the NISAs defined Non-Receivable Assets as those that would be