purchased "from time to time," as long as they were "related to the healthcare industry." The NISAs further required the Trustees' receipt of (1) certificates identifying identification of Non-Receivable Assets in a particular form and (2) certain defined "Purchase Documents" upon the acquisition of Non-Receivable Assets. In violation of the NISAs, the Trustees did not receive these certificates in the form required, and they did not ensure that the Purchase Documents were received in the form required. Had they met their duties under the NISAs and ensured receipt, they would have noticed that Medical Capital was purchasing non-conforming and ineligible Non-Receivable Assets, such as those described herein at ¶¶ 114-130.

76.     In fact, before Medical Capital received <u>any</u> funds to purchase <u>any</u> Non-Receivable Assets, the NISAs required the Defendants to ensure receipt of certain "Purchase Documents," as defined, and an "opinion of counsel in form and substance reasonably acceptable to the Trustee" that following acquisition of a Non-Receivable Asset, the Trustee would have a perfected security interest in such asset. On information and belief, for the vast majority, the Trustees did not obtain such opinions of counsel as required by the NISAs. On information and belief, the Trustees failed to obtain Purchase Documents for the majority of Non-Receivable Assets, including assets from LaviPharm Laboratories, Robert Aquino, M.D., Capitol Health Management, Parkway Hospital, Concept 1 Academies, eMark Advertising, Forefront Technologies, and Viva Vision, among others.

77.     Examples of abuse of the designation, purchase and maintenance of Non-Receivable Assets can be found with regards to Trace Life Sciences ("Trace"), a nuclear medicine provider with its own reactor at its facility in Texas. MP III disbursed multiple sets of funds to Trace even after it was apparently unprofitable, so that Trace could continue to make payments on the loan, and thereby, MP III could avoid an Event of Default. Trace is listed in the <u>December</u>

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

23

31, 2007 NCCR Report with a medical receivables amount of $152,439.44. By April 2009, MCC was reporting that Trace owed over $50 million on the Loan as a Non-Receivable Asset (the "Trace Loan"). There was even litigation involving Trace in September 2008 – an officer was ousted, resulting in threats of sabotage and subsequent litigation to obtain a restraining order. *See* **Exh. 2**, attached hereto. In court filings, MP III admitted to making loans totaling over $27 million since 2006. *See* **Exh. 3**, attached hereto. In fact, Trace and MP III even engaged in a contemporaneous interest payment/draw on the Trace Loan of $785,552.40/$785,339.03 on May 8, 2008, contemporaneous with numerous other red flags apparent in the MP III account.

78.    Of course, the situation with Trace could have been avoided entirely if Defendant Wells Fargo, the Trustee overseeing the Trace Loan, had properly obtained the Purchase Documents and certifications required under the NISAs to verify the Trace asset at the inception of the MCC/Trace relationship. On information and belief, Wells Fargo did not obtain conforming Purchase Documents.

79.    **NCCR Reports**: As described at ¶¶ 48-50, § 3.05(h) of the NISAs required MCC to provide the Trustees with a particular type of report, known as a "Net Collateral Coverage Ratio" report ("NCCR Report"). The NCCR Report, with supporting documentation, was required in a particular form, and it was incorporated by reference other forms and certifications required under the NISAs. MCC was supposed to use a formula derived by adding together the value of all assets (including Eligible Receivables (as defined, and relying on receivables from Approved Payors), Non-Receivable Assets (as defined), the Trustee Accounts and any amounts in Lockbox Accounts in transit to the Trustee Accounts) divided by various liabilities (including the balance of notes payable issued, the next interest payments due, and bank fees) on the other. As long as the resulting ratio was over

1   100%, the SPC was not in default.  Further, MCC was entitled to the difference

2   between the assets and liabilities as an Administrative Fee.

3       80.     In violation of the NISAs, the NCCR Reports did not conform to form

4   as required.  Just one example is instructive: from at least <u>July 2005</u> to <u>February

5   2008</u>, the NCCR Reports for MP III contained a line item entitled "Less Amount

6   of Principal Due Within 30 Days," which was not part of the required formula.  *Cf.*

7   **Exh. 4** with **Exh. 5**, attached hereto.  This line item <u>reduced </u>the liabilities owed,

8   thus <u>increasing</u> the collateral ratio, and <u>increasing</u> the amount of Administrative

9   Fees paid to MCC.  Despite the use <u>on the face of the Report</u> of an incorrect

10  formula to determine the amount of Administrative Fees, the Trustees improperly

11  approved the payment of Administrative Fees.

12      81.     In addition, other forms and certifications required under the

13  NISAs and incorporated by reference in the NCCR Reports were missing entirely.

14  For example, the amount of Eligible Receivables was used as part of the ratio to

15  determine the amount of Administrative Fees.  The NISAs required Eligible

16  Receivables to be supported by a form and a certificate to the Trustees.  These

17  forms and certificates were not provided for all Eligible Receivables.  Those that

18  were provided, were not provided in the form required.  Therefore, the Trustee

19  breached its duties under the NISAs in releasing Administrative Fees.

20      82.     Further, Eligible Receivables were defined as those that an

21  "Approved Payor" was obligated to pay.  As described above, under the definition

22  of "Approved Payor," the NISAs required further certificates to be provided to the

23  Trustee that identified such payors, but these certificates were not provided as

24  required.  Therefore, for those forms and certificates for Eligible Receivables that

25  were received, many payors were listed that were not, in fact, Approved Payors as

26  required.  On information and belief, the Trustees did not even maintain a list of

27  all approved payors.

28

⊛
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

83.    **UCC-1 Financing Statements**: The NISAs further required
Defendants to ensure receipt of UCC-1 financing statements related to trust assets.
The UCC-1 financing statements were required to document the Trustees'
purported security interest in trust assets.  Section 3.05(g) of the Agreements
required Medical Capital to provide Defendants with collateral schedule that set
forth information concerning the UCC-1 financing statements showing
Defendants' security interest in collateral held by the SPCs.  The collateral
schedules did not contain the required UCC-1 financing statement information for
the collateral listed on the schedules.

84.    As discussed above, the Receiver has now found that there were no
active UCC-1 filings for 53 of Medical Capital's 104 accounts, and there were no
collections or advances on those accounts for many years.  These 53 accounts
represented $542 million of the $625 million in total receivables that was
purportedly held by the SPCs as of March 31, 2009.  At least one NISA (for MP
II) required the Trustee to file UCC-1 financing statements upon acquiring
knowledge that they were missing.  Because these UCC-1 financing statements did
not exist, the collateral reports and other documents required by the NISAs and
provided by Medical Capital to Defendants could not possibly have identified the
UCC-1 information required by § 3.05(g), and therefore, the reports did not
conform to the stated requirements of the Agreements.  By accepting those
defective collateral reports, and by disbursing fees to MCC on the basis of those
defective reports, Defendants breached the explicit requirements of § 5.06(a)(ii) to
the detriment of the Noteholders.

85.    Nonetheless, and in clear violation of the NISAs, Defendants
proceeded to improperly approve all requests for Administrative Fees.  In
approving these payments, Defendants claim that they relied "conclusively" on the
collateral reports submitted by MCC that supposedly supported its request for

✪
LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

administrative fees.  However, the NISAs specify that the Trustees cannot rely "conclusively" on forms and certifications that do not conform to the requirements of the NISAs, including those forms and certifications related to NCCR Reports, Eligible Receivables, Non-Receivable Assets, UCC-1 statements, and others.

86.    **Eligible Receivables:** According to Medical Capital's Receiver, the valuations of collateral in the NCCR Reports were falsely inflated because the valuations included receivables that were aged over 180 days.  An Eligible Receivable, however, is defined as one that is <u>not</u> aged over 180 days.  Under the terms of the NISAs, the Trustees were supposed to ensure their receipt of certificates containing information about the Eligible Receivables, including the date of purchase.  As described above, these certificates were not provided for all Eligible Receivables.  Therefore, the Trustees breached their duties in relying on the stated collateral values on the NCCR Reports when they failed to obtain the documents required under the NISAs.

87.    Of course, the reason for requiring this information was to prevent just the type of fraud that occurred.  According to the Receiver, the accounts receivable held by the SPCs as of <u>March 31, 2009</u> had a total stated value of approximately $625 million.  Through his investigation, the Receiver has found that while the $625 million in receivables purportedly held by the SPCs were attributable to 104 accounts, most of those accounts either did not exist or did not support the amounts of collateral that Medical Capital attributed to them.

88.    Of those 104 accounts, only 42 could be verified, representing just $80 million of the purported $625 million total.  Of those 42 verified accounts, only 6 contained receivables that were under 180 days old (and therefore, which could be counted in the NCCR Reports), representing only $6 million of the amounts owed.  The remaining verified accounts, representing $74 million of receivables, were older than 180 days (and therefore could not be counted in the

NCCR Reports), with the vast majority of receivables purchased between <u>2002</u> and <u>2006</u> and just two accounts showing receivables purchased in <u>2008</u>.

89.    **Receivable Acquisition Certificates:** The NISAs provided for the withdrawal of trust funds for the purchase of "Eligible Receivables, Non-Receivable Assets, or both," provided that Defendants received a particular certification known as a "Receivable Acquisition Certificate" with supporting documents incorporated therein.  Part of the supporting documents submitted with these Receivable Acquisition Certificates included a list of all the allegedly "Eligible Receivables."  Even a cursory review reveals the patently obvious nature of MCC's fraud.  In one example, a Receivable Acquisition Certificate submitted for MP V on <u>April 17, 2009</u> reveals that MCC requested money to purchase receivables for "Charity," "Rebill" (many of which were designated as "Claim Marked Ineligible"), "Private Pay", and Ricoh Business Solutions, among others. *See* **Exh. 6**, attached hereto.  None of these receivables were Eligible Receivables, and none of them were owed by Approved Payors.  Defendant Wells Fargo signed off on the withdrawal of noteholder funds based on these obviously fraudulent documents even as it <u>knew</u> that Medical Capital's other SPCs were in default.

3.    <u>**Defendants' Own Policies Required Them to Review and Track Medical Capital's Business Practices**</u>

90.    Separate and apart from the NISAs, Plaintiffs allege on information and belief that Defendants' own internal policies required them to perform due diligence on a regular basis to ensure that this type of situation did not occur.  For example, on information and belief, Defendants' policies, and the common practice of corporate trustees, required Defendants to set up "tickler" systems to help them track the business practices of Medical Capital.  The tracking system monitored the due dates for (1) the age of receivables; (2) when principal and interest was due and payable to Noteholders; and (3) when reports, certificates,

and statements were due to the Trustees.  These due dates were imposed by the NISAs.

91.     Defendants' tickler systems were automated so that Defendants' employees were alerted to the relevant dates and could ensure that Medical Capital complied with the NISAs.  Defendants ignored the tickler system and did <u>not</u> enforce the terms of the NISA and request the appropriate documents from Medical Capital, in some cases letting many months elapse before they took appropriate action.  One example from MP V is illustrative.  On <u>January 15, 2008</u>, Medical Capital was required to provide the Trustee with certain items for MP V, including (1) a Fourth Quarter <u>2007</u> schedule of all collateral and related UCC-1 filings, and (2) the NCCR Report for <u>December 2007</u>.  Although Defendant Wells Fargo knew that the items were due that day, its tickler system reflects that it did not ensure that items were received until <u>July 11, 2008</u> and <u>March 28, 2008</u>, respectively – <u>months</u> after the items were originally due.  *See* **Exh. 7**, attached hereto.  Communication received from Wells Fargo indicates that it did not actually receive the UCC schedule until <u>July 22, 2008</u>.  *See* **Exh. 8**, attached hereto.

92.     Of course, had Defendants been requesting and ensuring timely receipt of the documents required by the NISAs, and tracking the information regarding the age of the receivables, their own internal systems would have revealed the Medical Capital fraud.  Defendants were not only negligent in not following their own internal policies, but their own systems provided them with <u>actual knowledge</u>.

93.     Defendants' own policies also required them to conduct due diligence and thoroughly investigate new corporate trust clients, due to the prevalence of money laundering and other problems that Defendants, like all financial institutions, have historically experienced.  Sidney M. Field, the CEO and a

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

29

director of MCH and its affiliates, was sued for civil racketeering and fraud in connection with sham transactions and other deceptive practices arising out of his ownership of a California auto insurance company.  As a result of those suits, Field ultimately had his insurance license revoked and the company was liquidated by a bankruptcy trustee.  Defendants should have been aware of Field's troubling history from the due diligence they should have performed when retained as trustees.  Indeed, according to its own marketing materials, Defendant BNYM actively conducts background research on prospective clients and on active clients on an ongoing basis.  Awareness of Field's past history should have caused Defendants to view instructions from MCH and its affiliates with heightened skepticism, and their failure to do so evidences their bad faith.

94.    The limited document production that Plaintiffs have received describes some of Defendants' internal policies.  Defendants' internal policies (at least those that have been produced to date) provide extensive detail and guidance for the activities they are supposed to be undertaking with regards to their corporate trust clients.  Many of these policies were not followed.

### 4.    Defendants Improperly and Negligently Relied On Inflated Collateral Reports

95.    Section 5.08(a)(ii)(F) of the Agreements only allows the Trustees to disburse funds "[to pay the Administrative Fee if permitted by § 3.05(h)", and § 3.05(h) sets forth the certifications that MCC was required to provide to Defendants in support of its fee requests.  If Defendants knew that those certifications were false, they were prohibited under § 5.06(a)(ii) from relying on those certifications, and in the absence of reliable certifications from the administrator, Defendants were required to refuse payment of those fees.  However, Defendants breached the terms of the Agreements by disbursing funds

to MCC in payment of administrative fees in bad faith and despite their awareness that the certifications submitted in support of those fee requests were false.

96.     As already determined by the SEC and the Receiver, the NCCR Reports set forth in the certifications provided to Defendants were significantly inflated.  Collateral reports submitted to Defendants to justify payments of administrative fees, on their face, openly and notoriously inflated the value of SPC assets, including the inclusion of assets that were incapable of valuation, assets valued far in excess of their market value, medical accounts receivable that had been sold at false valuations between various SPC accounts managed by Defendants, and medical accounts receivable from accounts that were obviously inflated and, in the majority of cases, no longer even exist.

97.     The SEC's complaint provides examples of specific instances in September 2008 where Defendants rubber-stamped the payment of administrative fees to MCC based on obviously false certifications.  For example, MCC requested $7.85 million in administrative fees from MP VI based on a certification which stated that MP VI had collateral (receivables, other assets and cash) totaling $24.9 million against liabilities of $18.0 million.  *See* SEC Complaint at ¶ 52. However, MCC's calculation of collateral was falsely overstated by $18.5 million – approximately 75% – through the inclusion of fake and vastly overvalued receivables.  If Defendants had not willingly ignored MCC's blatant fraud but had instead challenged the accuracy of MCC's certification, not only would MCC not have been entitled to any administrative fees, but it would have revealed that MP VI was actually in default.

98.     The following chart shows other examples of false calculations of collateral used by MCC, and accepted without question by the Defendants, to obtain millions of dollars of administrative fees in September 2008:

⊛
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

| SPC | Claimed Assets | Claimed Liabilities | Actual Assets | Actual NCCR |
|---|---|---|---|---|
| MP IV series 1 | $257 million | $250 million | $128 million | 51% |
| MP IV series 2 | $172 million | $153 million | $73.7 million | 47.5% |
| MP V | $417 million | $405 million | $94.8 million | 21% |

*See* SEC Complaint at ¶ 53.

99.    One reason that those certifications were false was because they included falsely inflated collateral values of receivables that had been sold from one SPC to another.  As discussed at ¶¶ 131-142, and as set forth in detail in the SEC's complaint, Defendants executed numerous sales of falsely inflated, aged and worthless receivables between SPCs, at Defendants' instructions, and those inter-SPC transactions were used to further Medical Capital's Ponzi scheme.  The falsely inflated valuations of those fake, overstated and/or aged receivables were also fraudulently included in collateral reports submitted to Defendants as support for the payment of undeserved administrative fees to MCC.

100.    The Receiver's investigation has uncovered numerous instances where the same batch of receivables was sold and re-sold numerous times, over periods much longer than 180 days, and despite the advanced age of those receivables, the prices, and their associated collateral values, increased rather than decreased over time.  Medical Capital included the inflated valuations of those re-sold assets on the reports they submitted to Defendants, and which Defendants accepted without question.  For example, between February and April 2004, MP I acquired receivables associated with healthcare provider Advanced Radiology for $14.96 million.  In July 2007, despite the fact that MP I did not receive any payments from those receivables, and did not purchase any additional Advanced

Radiology receivables, MP I sold those same receivables to MP VI for $18.55 million – an increase in value of nearly $3.6 million, despite the substantially increased age of those receivables.  In October 2008, MP IV turned around and sold that same batch of receivables to MP VI for $20.59 million – another increase of over $2 million, despite the fact that those receivables were now over four years old (and, for all practical purposes, entirely uncollectible).  *See* AMD. 10 Day Receiver Report at 23-24.  Defendant BNYM was the trustee for each of MP I, MP IV and MP VI at all relevant times, and in that role, BNYM executed each of those highly suspect sales of Advanced Radiology receivables from one SPC to another, at ever-increasing prices, despite the fact that those prices were obviously falsely inflated.

101.   Defendants knew that the collateral values set forth in Medical Capital's certifications were fraudulently inflated and included aged batches of receivables because Defendants had themselves disbursed the funds for Medical Capital's repeated sales and re-sales of those batches of receivables between SPCs at falsely inflated prices.  Those repeated sales of receivables between SPCs were inherently suspicious and put Defendants on notice of Medical Capital's misconduct.  More specifically, because Defendants knew that certain batches of receivables were sold and re-sold multiple times over periods longer than 180 days at constantly increasing prices (and valuations), Defendants were aware that the collateral values of those receivables were falsely inflated.  Thus, Defendants paid hundreds of millions of dollars in administrative fees despite their knowledge that the collateral reports used to support the fee requests were false and unreliable.

102.   However, the accounts receivable that were sold between SPCs were not the only assets that were falsely valued on the certifications.  According to the Receiver's investigation, the overwhelming majority of the receivables that were held by the SPCs were greatly overvalued, aged, worthless or simply do not exist.

Those receivables were included at falsely inflated valuations on the certifications submitted in support of requests for administrative fees, and despite the falsity of those certifications, the Trustees approved those requests and paid the requested fees without question.  Indeed, as Mr. Lampariello testified to the S.E.C., the Trustees never questioned the existence or valuations of <u>any</u> of the receivables alleged to have been purchased.  *See* Declaration of Nicholas S. Chung (Dkt No. 6 in the SEC Action), Exh. 1 at p. 40.

103.  As noted above, the operation of each SPC was governed by, among other contracts, a NISA between the SPC and the Trustee.  Pursuant to the NISA and Administrative Services Agreements, MCC could request payment of an Administrative Fee by providing a written certification by the SPC (prepared by MCC as Administrator) to the Trustee.  The certification included the calculation of the Net Collateral Coverage Ratio, which was supposed to be derived by adding together the value of all cash, eligible receivables and collateral, then dividing that number by the amounts payable under the NISA and Notes issued thereunder (principal due at maturity and interest then due to Noteholders).  In valuing collateral, accounts receivable were only "eligible" to be included if they were purchased within 180 days of the date the claim was submitted to the payor.  Additionally, loans made by SPCs had to be valued using the lesser of the principal and interest due from the borrower or the value of the property securing them.  If the Net Collateral Coverage Ratio was greater than 100% (i.e., the stated value of the assets exceeded the current liabilities), MCC took the position with the Trustee that it could request an Administrative Fee in an amount up to the entire balance in the account above and beyond that necessary to maintain the 100% ratio.

104.  According to its agreements and disclosures, the SPCs (through MCC as administrator) were to have all real and personal property securing loans and

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

investments appraised at least once a year by an independent appraiser. The SPC was to then certify each year that the required valuations had been completed. Each certification of the Net Collateral Coverage Ratio was to be based on the most recent valuations. Thus, MCC was only entitled to an Administrative Fee if, based on recent independent valuations, the Net Collateral Ratio was at least 100%, and only if such fees could be payable from valid and collected accounts receivable.

105.   As of <u>March 31, 2009</u>, MCC, as administrator of the SPCs, controlled receivables, loans, or investments owned by the SPCs with a purported total value of over $1.2 billion.

106.   Despite raising about $2.2 billion from investors and controlling over $1 billion in purported assets, MCH and MCC did not keep the SPCs' financial statements in accordance with GAAP or even keep their accounting records in a manner that would allow GAAP financial statements to be generated. For example, according to the Receiver, at the time they purchased a batch of receivables, the SPCs recorded as revenue the amount that expected collections exceed the purchase price and never reconciled actual collections with expected collections.

107.   Further, while the Receiver's most recent Report indicates that the medical accounts receivable were attributed to just 104 accounts, most of these accounts either did not exist or did not support the collateral values assigned to them. According to the Receiver, the 104 accounts total about $625 million. However, of those 104 accounts, only 42 could be verified, representing just $80 million of the total. Of the 42 verified accounts, just six contained accounts receivable aged under 180 days, representing $6 million of the amounts owed. The remaining verified accounts, representing $74 million of debt, were aged more

than 180 days (with the vast majority purchased between 2002 and 2006 and just two accounts showing receivables purchased in 2008).

108.   Even more troubling, 53 of the 104 accounts – representing $542 million of the $625 million total medical accounts receivable – could not be verified at all, i.e., they "no longer exist." The Receiver further found that there were no MediTrak reports to support such accounts and, instead, that the MediTrak reports either indicate that the accounts were closed or did not list the accounts at all. The Receiver found that there were no active UCC-1 filings for the accounts and that there were no collections or advances on the accounts for years. The Trustees willfully and/or recklessly ignored all of this information and approved fees without question.

109.   The same overstatement of collateral values occurred with respect to non-medical receivables assets, which were consistently and grossly overstated in MCC's reports to the Trustee Defendants. For example, a substantial acquisition loan was listed at the amount of its outstanding balance despite the fact that the lendee could only make interest payments by drawing down on its letter of credit extended by an MCC affiliate. MCC listed the entire balance due on other loans after foreclosure on the collateral, rather than the post-foreclosure value of the assets confirmed by appraisals. With the Trustee Defendants unwilling to consider or challenge such clear evidence and, instead, merely rubber stamping their requests for fees, MCC continued to seek and obtain administrative fees based on the submission of such inflated collateral reports.

110.   Of course, the Trustees had full power and discretion to require further verification. The Trustees were specifically provided the right to require the "Debtor" to provide a confirming opinion of independent counsel that all conditions were satisfied. In the exercise of their fiduciary and contractual duties,

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

36

the Trustees should have insisted upon such confirming opinions of independent counsel and other additional information.

111.   The Trustees also could rely only on documents that it "reasonably" believed to be genuine.  These provisions, and others, essentially created a duty on the part of the Trustees to request and review the information provided to them with reasonable care and professional skepticism, and not merely to rubber stamp requests for disbursements.

112.   Indeed, while acting as a Trustee for SPCs, The Bank of New York Trust Company, N.A. ("BNYTC") was in the heat of major litigation with noteholder investors of another California-based medical receivables company, DynaCorp Financial Services, relating to its role as a trustee.  According to plaintiffs in the case, BNYTC allowed company insiders to improperly commingle investor funds between various trusts and operate a Ponzi scheme.  In 2005, a jury found that BNYTC breached its agreement and acted with gross negligence, returning a verdict of $15.7 million.  In January 2008, the Court of Appeal affirmed the trial court's order granting a new trial and denying both plaintiffs and BNYTC's respective motions for judgment notwithstanding the verdict.

113.   In recent correspondence sent to Noteholders, the Trustee Defendants have highlighted their efforts – in 2009 – to monitor the SPCs' accounts receivable, including the engagement of third parties to value collateral. Defendants have further noted their refusal to honor requests by MCC to release funds from trust accounts to pay for accounts receivable due to MCC's failure to provide sufficient information to make a reasonable determination about whether the funds would be paid back.  Defendants don't explain their failure to take action prior to 2009.

**THIRD AMENDED CONSOLIDATED COMPLAINT**

5.     **Defendants Improperly Disbursed Funds for the Purchase of
Plainly Impermissible Assets**

114.   Defendants breached their duties under the Agreements by improperly disbursing Trust funds for the purchase of assets which were plainly and obviously impermissible uses of funds under the express terms of the Agreements.  According to the Agreements, MCH was supposed to use the proceeds from the sale of the Notes to purchase healthcare related accounts receivables at a discount and make investments in other healthcare related assets. Defendants were required to, among other things, obtain certain documentation prior to disbursing of funds, and disburse funds only for the purchase of healthcare-related assets as provided under the Agreements.

115.   However, Defendants disbursed trust funds for the purchase of numerous unpermitted assets, despite the obvious fact that these investments were entirely unrelated to the healthcare industry.  It would have been clear on the face of the documentation submitted to the Trustees by Medical Capital that these assets were non-healthcare-related and were thus unpermitted.

116.   The Agreements strictly limited the types of assets that could be purchased by Medical Capital to either: (1) healthcare related accounts receivables; or (2) any "stock, debt instruments and other tangible and intangible assets, moneys, rights, and properties related to the healthcare industry." Agreements at Article I ("Definitions"); see also § 5.08(a)(ii)(E).  On the "Acquired Assets" schedule that accompanied the certificate Medical Capital submitted to the Trustees to request disbursement of funds, Medical Capital was required to "specify the type of Non-Receivable Asset" it sought to acquire.  *See* Agreements at § 5.08(a)(ii)(E), Exhibit A-2 ("Non-Receivable Asset Acquisition Certificate") and Schedule A to Exhibit A-2 ("Acquired Assets" schedule).

117.   Despite the clear mandate of the Agreements, Defendants nonetheless approved the disbursement of funds for the purchase of non-healthcare related assets, pursuant to certificates that were, on their face, in violation of the Agreements, including:  an "investment" in a company that owns the rights to a film about little-league baseball players; "investments" in companies whose primary business is marketing content and/or ringtones for mobile phone applications, including marketing for a live video stream of a hamster in a cage; and a loan to an internet advertising company that specializes in pornographic website advertising and spam email services:

### a.      The Perfect Game, LLC

118.   The Perfect Game, LLC ("TPG") is a Nevada limited liability corporation whose primary asset is the rights to a film entitled The Perfect Game. The Perfect Game is about a Little League team from Mexico that won the Little League World Series in 1957.  MP IV owns a 40% interest in TPG and also made loans to TPG of over $18 million.  MCH holds 75% of the voting rights in TPG. TPG formed High Road Entertainment Group, LLC ("High Road") to produce the film.  MP IV owns a controlling interest in High Road.

119.   According to the Receiver, the film was released in the United States and Canada in April 2010, but "[b]ox office receipts did not meet projections and the Receiver does not expect a return from the theatrical sales of the film."

### b.      Viva Vision, Inc.

120.   Viva Vision, Inc. ("VVI") is a California corporation whose primary business is  marketing content for mobile phone applications.  According to the Receiver's interview of Fazio, the initial content being marketed by VVI was a live video feed of a hamster in a cage, though Field and Lampariello now claim it has significant potential.  It appears that MCH and/or MP III.2 purchased stock in VVI over time, beginning in November of 2005, for a total purchase price of $12.0

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

million, and that MCH and/or MPIII.2 now own 99.4% of the company.  VVI was also provided with a line of credit, and currently owes $7.2 million in loans to Medical Capital entities.  As of June 30, 2009, MCC listed as collateral for MP III.2 "Non AR Purchase" owed by "Vivavision" in the amount of approximately $6.9 million.

121.   On July 30, 2010, the Court approved the sale of the VVI stock held by MP III.2 for $1.25 million – $10.75 less than MCH and/or MP III.2 paid for the stock.  According to the Receiver, VVI "is not financially capable of repaying the loan from Medical Capital."

### c.   Single Touch Interactive, Inc.

122.   Single Touch Interactive, Inc. ("STI") is a Nevada corporation whose primary business is providing mobile phone applications such as "shortcuts" dialing and ringtones.  According to the Receiver, loans were apparently made to STI and its former majority shareholder, Anthony Macaluso, that were secured by 25 million shares of STI.  Fazio also told the Receiver that this account was handled personally by Lampariello and that, after loan defaults occurred, there was a consensual foreclosure on the STI shares.

123.   As of June 30, 2009, MCC listed as collateral for MP IV.1 under "All Other Receivables, Supporting Receivables" an amount owed by STI of approximately $5.4 million, and listed a "Non AR Purchase" owed by Macaluso in the amount of approximately $10.5 million.

### d.   E Mark

124.   According to the Receiver's latest Report, MP III made a loan to E Mark, an internet advertising company.  The OCWeekly, in an article entitled, SEC Investigation of Medical Lender Sets Sail for a Party Yacht, reported that E Mark specializes in pornographic website advertising.  OCWeekly also interviewed a former MCH executive who reportedly stated that the E Mark

account was "untouchable" and that there was no documentation for underwriting the loan.  According to the Receiver's latest report, he has found evidence that Medical Capital was allowing payments on this loan to be made "to an account not controlled by Medical Capital," and the Receiver's investigation into this asset is ongoing.

### e.     Pyramid Technologies, Inc.

125.   According to the Receiver's latest Report, MP IV made a loan to Pyramid Technologies, Inc., a company that supplies liquid filtration products, on information and belief.  The loan is currently in default and there is an outstanding principal balance of approximately $14 million.

### f.     Mail.com Media Corporation

126.   According to the Receiver's latest Report, MP III made a loan to this entity (formerly known as Velocity Services, Inc.), a leading publisher and digital media company that owns properties such as OnCars.com, Deadline.com, HollywoodLife.com, Movieline.com, BGR.com, YHAwards.com, HollyBaby.com, Fan.com, India.com and others, that had an outstanding principal balance of $15 million.  The Receiver agreed to a discounted payoff of this loan, and the Court approved the transaction.

127.   These investments were plainly and obviously unrelated to the healthcare industry, and Defendants should have been aware of that fact.  None of these assets were healthcare related, and all of these purchases were in direct breach of the Agreements.  Indeed, looking at the forms for disbursing such funds – which required Medical Capital to "specify the type of Non-Receivable Asset" it sought to acquire – it should have been clear on their face that Medical Capital was seeking to purchase non-healthcare-related assets.  In light of the obvious non-healthcare-related nature of the assets in question, the Certificates could not

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

41

have set forth any explanation of these assets which Defendants could have accepted as falling within the definition of "Non-Receivable Assets."

128.   Accordingly, Defendants knew the SPCs were not permitted under the Agreements to purchase these non-healthcare-related assets, and Defendants were not permitted to assist Medical Capital's purchase of those assets.  However, Defendants nevertheless dispersed funds for the assets in clear violation of the Agreements.

129.   Further, although Defendants were presented with Non-Receivable Asset Acquisition Certificates for the purchase of assets plainly unrelated to the healthcare industry, Defendants' failure to question those instructions or seek an opinion of counsel demonstrates their bad faith.  The Agreements contain provisions which expressly permit Defendants to demand additional assurances from Medical Capital, including "an opinion of counsel reasonably acceptable to the Trustee," that the representations provided in Medical Capital's instructions to Defendants were truthful and accurate.  *See* §§ 3.07(a), 9.04 (except MP III & MP IV § 10.04).  Defendants' refusal to exercise the authority to seek additional information from Medical Capital to verify the accuracy (or confirm the falsity) of Medical Capital's instructions supports the conclusion that Defendants performed their contractual duties in bad faith.

130.   The Receiver's reports show that many of these unpermitted assets are now worth significantly less than their original cost, demonstrating that the Noteholders were harmed by Defendants' purchase of these unpermitted assets.  *See generally* Receiver's Fourteenth Report to the Court (Dkt. No. 375 in the SEC Action) ("Fourteenth Receiver's Report").

///

///

///

**THIRD AMENDED CONSOLIDATED COMPLAINT**

42

6.   **Defendants Knowingly Executed Fraudulent Sales of Receivables**
**Between SPCs**

131.   According to the Receiver and the SEC, Medical Capital's records
indicate that the Trustees regularly effected the sale of fake, overstated and/or
aged accounts receivable from older SPCs to newer SPCs, at Medical Capital's
instructions, so that the older SPCs would have cash to (a) pay principal and
interest to investors, and (b) pay administrative fees to MCC.  This Ponzi-like
scheme allowed Medical Capital to use new investor funds (invested in the newer
SPCs) to conceal the fact that the older SPCs did not have sufficient assets to pay
out principal and interest owed to investors, and to pay administrative fees to
MCC.

132.   According to the SEC, the numerous sales of fake and overvalued
receivables between SPCs amounted to a Ponzi scheme whereby Medical Capital
siphoned off millions of dollars in newly invested funds and funneled them to
other SPCs to pay to investors.  *See* First Amended Complaint (Dkt. No. 111 in the
SEC Action) at 3 ("Field, Lampariello, and MCC orchestrated intercompany
transfers of new investor funds to earlier offerings, through the sale of fake,
overstated and/or aged and worthless receivables, to make those new investor
funds available to pay principal and interest to investors in prior offerings, as well
as to pay administrative fees to MCC.").

133.   The scheme enabled the Trusts to continue meeting their payment
obligations to existing investors while artificially postponing the day of reckoning
for all of the SPCs.  The Receiver, who has identified 301 such sales between
SPCs, has found that "Medical Capital transferred loans and other assets
purportedly valued at just under $1 billion between the eight money raising
[SPCs], which facilitated the payment of earlier investors' principal from new
investors' funds."  *See* Fourteenth Receiver's Report at 7.

✪
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

43

134.   In light of the pattern of these repeated sales of fake and overstated receivables between SPCs, which usually occurred at extremely suspicious times (i.e., when the older SPCs desperately needed cash to make payments of principal and interest to investors), as well as other highly suspicious aspects of these transactions, the Trustees knew or purposely turned a blind eye to the fact that Medical Capital was using these sales to perpetuate its Ponzi scheme to maintain the false appearance that the older SPCs were in sound financial condition.

135.   Because Defendants controlled the funds in the trust accounts for each SPC, Defendants were involved in the execution of each of these sham sales of receivables between SPCs.  The perpetration of this Ponzi-like scheme would not have been possible had BNYM and Wells Fargo honored their obligations under the Agreements and rejected the facially improper requests to transfer receivables between SPCs.  Defendants would have been aware that Medical Capital was using these sales of receivables between SPCs to facilitate its fraudulent scheme based, among other things, on (a) the suspicious timing between the sales of receivables and Medical Capital's payments of principal and interest to investors, and (b) the increasing overvaluation of the same batches of receivables as they were sold from one SPC to another.  Had Defendants not acted in bad faith, but instead refused to execute Medical Capital's obviously fraudulent instructions, the older SPCs would have been unable to meet their payment obligations, which would have triggered Defendants' heightened post-default duties to act for the benefit of Noteholders.

136.   In its Complaint, the SEC sets forth details concerning sales between SPCs and payments to Noteholders, and the close timing between (I) the SPCs' receipt of cash from sales of overvalued receivables to other SPCs, and (ii) the SPCs' payments of principal and interest to investors, which support an inference

of Defendants' actual knowledge that those intercompany sales were being used to prop up Medical Capital's Ponzischeme. *See* SEC Complaint at ¶¶ 30-31.

137.   For example, according to the SEC, of the $76.9 million that was raised from investors by MP VI between August 2008 and June 19, 2009, over 54 percent (approximately $41.7 million) of those funds were used to purchase overvalued, aged and/or worthless receivables from prior offerings.  SEC Complaint at ¶ 30.  In contrast, according to the Receiver, only 12 percent (approximately $9.3 million) of those investor funds were used by MP VI to purchase new receivables and other assets, while approximately 32 percent ($24.6 million) of those funds were paid to MCC in administrative fees. *See* Amended 10 Day Report and Accounting of Receiver (Dkt. No. 40 in the SEC Action) at 12 ("AMD. 10 Day Receiver's Report").

138.   In fact, the SEC explains that, in September 2008 alone, over $16 million in investor funds were transferred from MP VI to older SPCs, through sham sales of receivables, so that those older SPCs could meet their payment obligations to investors.  MP VI first began raising funds from investors in August 2008. Only one month after MP VI began raising funds from investors, Medical Capital used over $16 million of those newly invested funds to cause MP VI to purchase receivables at inflated prices from older SPCs:

- MP VI paid $2 million of newly invested funds to MP II, and MP II paid over $5.4 million in redemptions and $1.48 million in interest to investors in that same month;

- MP VI paid $5.7 million of newly invested funds to MP III series 1, which paid over $7.8 million in redemptions and $700,000 in interest to investors in that same month;

- MP VI paid $2.3 million of newly invested funds to MP III series 2, which paid over $3.5 million in redemptions and $680,000 in interest to investors in that same month; and

- MP VI paid over $4.1 million of newly invested funds to MP IV series 1, which paid $3.825 million in administrative fees to MCC in that same month.

- MP VI (together with MP V) paid over $3.2 million of newly-invested funds to MP IV series 2, which in turn paid $1.9 million in administrative fees to MCC.

SEC Complaint at ¶¶ 31-32. Defendants knew or deliberately ignored the fact that Medical Capital essentially stole these funds from MP VI – which had been raised from investors only one month earlier – and gave them to older SPCs in exchange for overvalued, aged and/or worthless receivables so that Medical Capital could avoid defaulting on the payment obligations of those older SPCs. Moreover, a detailed schedule of inter-SPC transactions filed by the Receiver shows that Defendants effected MP VI's purchase of tens of millions of dollars in falsely overvalued receivables from older SPCs in August 2008 – the very same month that Medical Capital began raising funds from the Noteholders for MP VI. *See* AMD. 10 Day Receiver's Report at its Exh. 2.

139.   Even more remarkably, despite its knowledge that MP II was in default on its payment obligations in August 2008, Defendant BNYM (which served as the trustee for both MP II and MP VI) effected the sale of receivables from MP II to MP VI in September 2008 – only one month after MP II's default – in exchange for $2 million of MP VI's new investor funds. According to the SEC, since August 2008, MP II had defaulted on over $44 million in payments of principal and interest. *See* SEC Complaint at ¶ 34. However, as discussed above, BNYM, at Medical Capital's instruction, effected the sale of overvalued, aged

and/or worthless receivables from MP II to MP VI in exchange for $2 million which had only recently been invested in MP VI. It must have been obvious to BNYM that Medical Capital was orchestrating this sham transaction so that Medical Capital could use MP VI's newly-invested cash to meet the obligations of MP II, which (as BNYM knew) was already in default and was desperately in need of cash. However, BNYM ignored the obviously suspicious nature of this instruction from Medical Capital, and, in bad faith, simply executed Medical Capital's instructions to effect this fraudulent transaction.

140.   The Receiver's reports show that some intercompany transactions involved the sale of receivables at prices higher than the expected net receivables ("ENR"), i.e. not at a discount as represented in the Agreements and PPMs. For example, Wells Fargo disbursed funds for the purchase of Carter Medical receivables by MP III from MP I for $4.1 million, even though the ENR for those receivables was only $3.3 million. *See* AMD. 10 Day Receiver Report at Exh. 2. Further, many of these resales were for amounts greater than the original purchase price, and valued at amounts greater than the original collateral value. *See* AMD. 10 Day Receiver Report at p. 22-25.

141.   Common sense dictates that a successive sale should be priced and valued at a lower amount than the previous sale, not only because of collections to date, but also because of the greater risk involved in holding older receivables. With each successive sale between the SPCs, however, the receivables were often sold at a higher price and given a higher collateral value than the previous sale. For example, MP I sold NLV, Inc. ("NLV") receivables to MP IV for $3.7 million in August 2007. MP IV then sold the NLV receivables to MP V for $3.8 million in January 2008, which then sold the receivables to MP VI for $4.2 million in August 2008. *See* AMD. 10 Day Receiver Report at 24-25. At minimum, Defendant BNYM, which oversaw MP I, IV, and VI, must have known that