something was awry, since Medical Capital was claiming a higher collateral value and price for the last sale compared to the first.

142. On their face, such transfers – which followed the classic, obvious pattern of a Ponzi scheme in which cash from new investors is used to pay earlier investors – were presumptively improper and support an inference of Defendants' actual knowledge that should have triggered their obligations with respect to entry of default. Defendants' execution of hundreds of sales of receivables between SPCs, in bad faith and despite their knowledge that those receivables were vastly overpriced and that Medical Capital was using the cash from those sales to continue its fraudulent scheme, constituted a further breach of the Agreements, even beyond Defendants' payment of administrative fees based on collateral reports reflecting those overvalued receivables.

**E.     Events of Default**

143. Throughout the NISAs, there are references to Events of Default, and the NISAs contain special sections to describe the Trustees' responsibilities upon notification or knowledge of Events of Default. Once an Event of Default occurs and continues, the Trustee is held to a heightened duty of care to protect Noteholders. The Trustee is also required to notify Noteholders within 90 days of the occurrence of an Event of Default.

144. Under the terms of the NISAs, default occurred in at least three ways. The NISAs provide several definitions for an "Event of Default," including but not limited to (1) a breach of "any other covenant or provision" of the NISAs; (2) failure to pay interest/principal to Noteholders; (3) the "inability or unwillingness" of the SPC to pay debts, including administrative fees.

145. **Breaches of Covenants and Provisions of the NISAs:** As described extensively above, there were numerous breaches of the NISAs, including but not limited to the SPCs' failure to deliver statements, certificates, forms, opinions of

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

counsel, schedules, and other documents required by the terms of the NISAs. If delivered at all, documents did not conform to the form required by the NISAs. These breaches were unquestionably material because they enabled Medical Capital to obtain excessive administrative fees and to continue as a going concern without the proper review and scrutiny that should have occurred once covenants and provisions of the NISAs were breached.

146.    Further, based on the limited documents that Defendant Wells Fargo Bank has provided to date, it appears that in the <u>entire history</u> of the existence of both MP III and MP V, MCC failed <u>on each occasion a NISA-required document was due</u> to submit the document on time as required. For example, the Fourth Quarter <u>2007</u> schedule reflecting UCC financing statements for collateral for MP V was turned in on <u>July 24, 2008</u>, although it was due <u>seven months before</u> on <u>January 15, 2007</u>. *See* **Exh. 7**, attached hereto. On information and belief, the same practice existed with regards to MP II, IV, and VI. Meanwhile both Trustees continued to pay out Administrative Fees and allow MCC to make withdrawals for other purposes, even as they did not receive the documents as required under the NISAs and did not inform Noteholders of the SPCs' severe and continuing defaults.

147.    **Failure to Pay Interest to Noteholders**: On information and belief, from inception of the SPCs, there were isolated incidents of default in principal and interest payments. On information and belief, by <u>August 2008</u>, MP II had massively defaulted in principal and interest payments. However, BNYM, the Trustee for MP II, not only did <u>nothing</u> to help Noteholders, it went even further – by deepening its relationship with Medical Capital.

148.    Even with knowledge of the MP II default, Defendant BNYM continued to lend its name to allow Medical Capital to defraud even more investors. In <u>August 2008</u>, MP II defaulted on payments of principal. Despite its

failure to pay principal to MP II Noteholders in violation of the PPM, Medical Capital nevertheless prepared a new offering, MP VI, to investors in that same month.  Much like the other offerings, Medical Capital secured a trustee – BNYM – to provide an aura of legitimacy to the new offering.  Although Defendant BNYM, as the trustee for MP II, was well aware of MP II's default in <u>August 2008</u>, it nevertheless agreed to lend its name once again as trustee for the MP VI offering.  BNYM did not give notice to MP II Noteholders of an Event of Default in MP II until <u>November 10, 2008</u> – even as it continued to reap fees from its investment of Medical Capital-related funds.

149.  Defendant Wells Fargo also knew of default in principal and interest to Noteholders.  With respect to MP III, Series I notes with a maturity date of <u>July 19, 2008</u> were in default – even as, as alleged in ¶ 145, MCH was <u>seven months behind</u> in meeting its reporting obligations for MP III.  An Event of Default occurs when MCC fails to make any payment of principal and such default continues for 15 days.  The 16th day was <u>August 4, 2008</u>, but Defendant Wells Fargo allowed MCC to purchase so-called Eligible Receivables on that day – in clear violation of the NISA for MP III.

150.  **Inability to Pay Debts:** The suspicious timing of transfers (described at ¶¶ 131-142 above) between trust accounts reveals that the SPCs had an inability to pay their debts as they became due.  Had they not made such transfers, the SPCs would have been unable to pay their debts as they became due.  The Trustees had actual knowledge of the insufficiency of the balance of the accounts because they maintained the accounts.

F.    **The Trustees' Non-Action Following the Events of Default**

151.  As described above, the failure to ensure compliance with the covenant and conditions of the NISAs constituted an event of default.  Defendant Wells Fargo and, on information and belief, BNYM, were aware almost from the

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

50

inception of their relationship with Medical Capital that the company was failing to meet the covenants and conditions of the NISAs. Moreover, the tickler detail reports received to date demonstrate that Defendant Wells Fargo's employees did <u>not</u> seek to enforce the terms of the NISAs and negligently allowed weeks and months to pass before contacting MCC to obtain the requisite documentation – <u>even as they paid the requested Administrative Fees</u> to the non-compliant MCC.

152.   On information and belief, both Trustees were informed of the default in principal and interest payment to Noteholders in MP II no later than <u>August 2008</u>. Yet they did not (1) inform Noteholders of the default; (2) move to exercise <u>any</u> rights inuring to them under the NISAs in the case of Events of Default; or (3) otherwise act to protect Noteholders' interests for <u>months</u>. In fact, they did not even send out a notice to Noteholders until <u>November 2008</u>.

153.   By <u>February 2009</u>, Medical Capital and the Trustees were in communication about Medical Capital's Events of Default. Despite the Events of Default, for which Defendants' own internal policies and the NISAs required specific action, Defendants continued to communicate with Medical Capital's management and did not take prudent action to protect the Noteholders. In <u>February 2009</u>, Medical Capital retained an "independent" consultant known as Waverton Group LLC ("Waverton"). This consultant was, on information and belief, referred to Medical Capital by an affiliate of one of Medical Capital's broker-dealers, a company known as Signature Advisors ("Signature," and together with Waverton, "Medical Capital's Consultants"). Signature and Waverton worked together to "validate" MP II's assets and began work on a second report for MP III, which was never finished. Throughout this process, although Defendant Trustees, their own consultant CT Moffitt, and even broker-dealer due diligence provider Mick & Associates, apparently expressed doubt about the independence and/or the truthfulness of the report produced by Medical

Capital's Consultants, the Trustees still did <u>not act</u> as required by the terms of the NISAs. *See* **Exhs. 10, 11**, attached hereto.

154.   Beginning in <u>December 2008</u>, both Trustees noticed and participated in conference calls with Noteholders, where they assured Noteholders that their role was "[t]he role of the Trustee is to protect the interest of the Series II Noteholders. The Trustee is not related to MedCap IV or Medical Capital Corporation, and therefore will exercise independent judgment in fulfilling its responsibilities." *See* **Exh. 1**, attached hereto. These representations were misleading to Noteholders such as Plaintiffs, as the Trustees now assert that they do not have <u>any obligations or duties</u> except as prescribed in the NISAs. Moreover, Defendant Wells Fargo waited until <u>March 23, 2009</u> – months after Events of Default had begun and were continuing – to inform MCC that it was holding it to a "stricter adherence to the requirements of the [NISAs]." *See* **Exh. 12**, attached hereto.

155.   Of course, the Trustees were not even meeting their obligations and duties under the NISAs – and had not been for many months. On <u>June 9, 2009</u> – months after the original Event of Default in MP II – Wells Fargo finally hired its own consultant, CT Moffitt & Co. ("CT Moffitt"), which almost immediately discovered systemic problems at Medical Capital, including severe problems with the form of the documents that Wells Fargo had blindly accepted to approve the payment of administrative fees to Medical Capital. CT Moffitt discovered, for example, that documents required to authenticate the requests for administrative fees – such as those required to authenticate Approved Payors, and therefore Eligible Receivables and the NCCR Reports themselves – were missing or improperly completed. *See* **Exh. 13**, attached hereto. On information and belief, each MP suffered from the same problems, and believe that once document production is complete, there will be evidence to support this assertion.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

Meanwhile, on information and belief, CT Moffitt was paid out of noteholder funds to perform the work that Wells Fargo <u>should have been doing all along</u>.

156.   Nearly twelve months passed between the <u>August 2008</u> default in MP II and the SEC's Complaint and request for the appointment of a receiver. During this entire period, the Trustees did <u>nothing</u>, except act to protect their own interests.  Making matters worse, Defendants' recent actions have only exacerbated Plaintiffs' losses and constitute further breaches of their fiduciary duties to Plaintiffs.  According to recent Trustee correspondence, the Trustees have incurred substantial professional fees and expenses to try to determine the true scope of the SPCs' business and the true value of their assets, work they should have performed years ago.

## G.    The Trustees Profit From Their Negligence and Bad Faith

157.   The Trustees profited handsomely from their continued relationship with Medical Capital.  The Trustees received a fee of $35,000 per year per SPC for which they served as Trustee.  In addition, they received administrative fees, such as fees for frequent wire transfers , including transactions between themselves.

158.   The Trustees also apparently reaped profits from their investment purchases through the receipt of "12B1 Fees."  Such fees are received by fiduciaries, such as trustees, who exercise their independent judgment in managing the assets of trust monies.  The larger the amount of money under management, the higher the amount of 12B1 Fees that the trustee can receive.  The Trustees were able to invest not only in conservative securities such as Treasury bonds and certificates of deposits, but also in mutual funds of their choosing, and even repurchase agreements that they would execute with investment banks such as Goldman Sachs.  On information and belief, these repurchase agreements were profitable for the Trustees.  On information and belief, certain of these investment

vehicles required that the Trustees maintain monies for periods of time, and if they were withdrawn early, then the Trustees' profits would be reduced.

159.   The trustees reaped profits from their investment purchases through the receipt of "12B1 Fees." Such fees are received by fiduciaries, such as trustees, who exercise their independent judgment in managing the assets of trust monies. The larger the amount of money under management, the higher the amount of 12B1 Fees that the trustee can receive.

160.   Based on the incomplete document production received from Defendants to date, Defendant BNYM earned at least $313,000 in 12B1 Fees, and on information and belief Wells Fargo earned a similar amount. The receipt of these 12B1 Fees, as well as the tying up of SPC funds in particular investments of Defendants' choosing, provided Defendants with the incentive to keep Medical Capital going at all costs, to neglect their duties to follow up on the numerous breaches of the NISAs, and not to provide Noteholders with notice of an Event of Default, lest Noteholders demand that Medical Capital be liquidated.

**H.      The Trustees' Liability**

161.   With regard to Defendants' contractual duty to verify instructions from Medical Capital, the Agreements explicitly state that "in the case of any such certificates or opinions which by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform as to form with the requirements of this Note Agreement and whether or not they contain the statements required by this Note Agreement." *See, e.g.*, MP IV NISA § 5.06(a)(ii). As described in detail above, Defendants' failure to ensure that documents required by the NISAs did <u>not</u> conform as to form, and therefore, the Trustees breached their duties under § 5.06(a)(ii).

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

54

162.   In addition to Defendants' duty to examine all certificates or opinions provided by Medical Capital, the Agreements state that Defendants may only rely on the truth of the statements in any certificates or opinions "[i]n the absence of bad faith on [the Trustees'] part."  *Id.*  Plaintiffs allege that the Trustees acted in bad faith by (1) disregarding <u>months</u> of dilatory practices from MCC and MCH; (2) ignoring the requirements of the NISAs; (3) acquiring actual knowledge of breaches of the NISAs; (4) in the case of BNYM, lending its name to a further Medical Capital offering under such circumstances; and ultimately, (5) refusing to act to protect Noteholders' interests – until it was too late to do anything.  Further, the Trustees' delay in declaring Events of Default as to the  respective SPCs constituted bad faith.

163.   Defendants' ability to exculpate themselves from liability is also expressly limited by § 5.06(f), which states that "[t]he Trustee[s] shall have no liability for actions taken at the direction of the Debtor, except for negligence or willful misconduct in the performance of its express duties hereunder."   Similarly, § 5.06(j) states that "[t]he Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its powers; provided, however, that the Trustee's conduct does not constitute willful misconduct, negligence or bad faith."   Therefore, regardless of whether Defendants were acting at the direction of Medical Capital or were acting on their own, the Agreements explicitly provide that Defendants can be held liable for actions that they performed negligently, with bad faith or with willful misconduct.

164.   Defendants did not even provide normal good faith scrutiny of Medical Capital's instructions, and there were many red flags that should have caused Defendants to perform their duties under the Agreements with heightened scrutiny.

165.   Defendants were aware that of all of the entities involved in the issuance and administration of the Notes, they were the only entities that were unrelated to the issuer, and, thus, were the Noteholders' only line of defense against possible fraudulent and collusive actions by Medical Capital.  For this reason alone, Defendants should have carefully examined any suspicious or questionable instructions from Medical Capital.

166.   Defendants had the benefit of experience serving as trustees of similar investment vehicles created by other medical receivable companies, with notice of the unique risks" associated with such operations.  For example, while BNYM was serving as Trustee for certain of the SPCs, it was involved in litigation with investors in a California-based medical receivables company for its role as trustee; in that litigation, the trustee allegedly allowed company insiders to operate a Ponzi scheme and improperly commingle investor funds between trust accounts.  Defendants' awareness of these circumstances – including involvement in litigation where the issuer was alleged to have engaged in the same types of improper conduct as alleged in this action – should have caused Defendants to exercise greater scrutiny of the instructions submitted by Medical Capital, and their failure to do so speaks to Defendants' bad faith.

## I.   Damages

167.   Beginning in August 2008 and continuing through the present, MP II through VI defaulted on their obligations to make payments of interest and/or principal to Noteholders.  According to the Receiver, over $1 billion in principal is still owed to Noteholders and "it appears that noteholder will almost certainly suffer significant losses on their investments."

168.   According to the Receiver, as of June 30, 2009, MCC reported collateral securing obligations to Noteholders with an aggregate value of over $1.1 billion, but in July 2009 collected only approximately $317,000.  The Receiver

also found the existing financial records of the SPCs to be generally unreliable based on, among other things, the failure to comply with GAAP accounting rules, and that accountants were in some cases given specific instructions as to how to account for various matters, calling into questions the resulting figures.

169.   The Receiver further detailed the fees paid by, and the amounts owed to, Noteholders for each of the SPCs, as follows:

**MP II**

170.   MP II received total funds from investors in the amount of approximately $251 million.  MCC was paid administrative fees of approximately $55.6 million.  As of June 30, 2009, reports by MCC indicate that the outstanding balance payable on issued notes was approximately $88 million.

**MP III**

171.   MP III, which is divided into two series, received total funds from investors in the amount of approximately $354 million.  MCC was paid administrative fees of approximately $48.6 million.  As of June 30, 2009, reports by MCC indicate that the outstanding balance payable on issued notes was approximately $109 million.

**MP IV**

172.   MP IV, which is divided into two series, received total funds from investors in the amount of approximately $407 million.  Investors have received principal in the amount of $6.416 million and interest in the amount of $58 million.  MCC was paid administrative fees of approximately $56.6 million.  As of June 30, 2009, reports by MCC indicate that the outstanding balance payable on issued notes was approximately $401 million.

**MP V**

173.   MP V received total funds from investors in the amount of approximately $403 million.  Investors received principal in the amount of $2.32

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

million and interest in the amount of $41.063 million.  MCC was paid administrative fees of approximately $48 million.  As of <u>June 30, 2009</u>, reports by MCC indicate that the outstanding balance payable on issued notes was approximately $401 million.

**MP VI**

174.   MP VI received total funds from investors in the amount of approximately $75 million.  Investors received principal in the amount of $.914 million and interest in the amount of $3.688 million.  Of the amount raised by investors, $9.326 million was used to purchase new accounts receivable and make other investments, and $41.715 million was used to purchase assets from prior MPs.  MCC was paid administrative fees of approximately $24.6 million.  As of <u>June 30, 2009</u>, reports by MCC indicate that the outstanding balance payable on issued notes was approximately $74 million.

## V. <u>CLASS ALLEGATIONS</u>

175.   Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure.  The Class is defined as follows:

> All persons and entities who purchased notes in MP II, III, IV, V and VI and have suffered damages (the "Class").

Excluded from the Class are the Defendants herein, and the subsidiaries, parents, affiliates, or controlled persons or entities of Defendants, as well as their family members, employees or representatives.

176.   The members of the Class are so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believes that the notes were sold to approximately 20,000 Class members.

177.   Plaintiffs' claims are typical of the claims of the members of the Class, as the Defendants served as Trustees over MP II, III, IV, V and VI and the claims are based upon similar conduct affecting all Class members.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

178.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests which are contrary to or in conflict with those of the Class members which they seek to represent.

179.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to individually seek redress for the wrongs done to them.  Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

180.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among questions of law and fact common to the Class are:

    a.    whether Defendants breached contractual duties owed to Plaintiffs; and

    b.    whether Class members were damaged and the measure of damages.

181.   The names and address of the Class members are available from the business records of Defendants or from the various SPCs.  Notice can be provided to the Class members by first class mail and by using other techniques customarily used in class actions.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

59

# VI. CAUSE OF ACTION

## FIRST CAUSE OF ACTION

### (BREACH OF CONTRACT)

182.   Plaintiffs hereby incorporate all of the foregoing paragraphs.

183.   Defendants acted as Trustees for the holders of notes issued by the SPCs under Note Issuance and Security Agreements ("NISAs"), as described herein.

184.   For example, Defendant Wells Fargo entered into a NISA dated June 25, 2007, a First Supplemental NISA dated April 10, 2007, and a NISA dated October 8, 2007.  Similarly, Defendant BNYM entered into a NISA dated October 23, 2006 and a First Supplemental NISA dated May 23, 2007.  Discovery is continuing as to the full extent of documents executed by Defendants.

185.   Plaintiffs and members of the Class were intended third party beneficiaries of the NISAs entered into by the Defendants, who promised to perform certain duties as trustees and to be paid for providing these trustee services.

186.   Under the terms of the NISAs, each series of notes issued by the SPCs was supposed to be secured by its own set of medical receivable assets. Defendants were charged with maintaining a separate trust account for each series of notes, with amounts relating to collateral deposited into the appropriate trust account.  Once funds were deposited into the trust accounts, they were under the exclusive control of the Defendants.

187.   MCC, MCH, MTS and the SPCs had no authority to make distributions from the funds in the trust accounts.  Rather, the Defendants had the exclusive authority to make appropriate distributions based on appropriate inquiry and verification, and pursuant to the priority of payments stated in the NISAs.  The Defendants were not permitted to approve and permit disbursements for

administrative fees without certifying that all conditions had been satisfied and, even then, could not pay fees from investor funds.

188.   For all these reasons, Defendants failed to perform their contractual obligations under the NISAs as required and alleged herein.

189.   As a result of the wrongful conduct of Defendants, Plaintiffs and the Class have suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## VII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

1.   Declaring this action to be a proper class action on behalf of the Class defined herein;

2.   Damages according to proof;

3.   Prejudgment interest at the maximum legal rate;

4.   Costs of the proceedings herein;

5.   Reasonable attorneys' fees;

6.   All other and further relief as the Court deems just.

///

///

///

///

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: March 1, 2011

COTCHETT, PITRE & McCARTHY, LLP

By:

JORDANNA G. THIGPEN

MILBERG LLP

By:

JEFF S. WESTERMAN

*Interim Co-Lead Counsel for Plaintiffs and the Class*

MINAMI TAMAKI

Derek G. Howard (118082)
Bethany Caracuzzo (190687)
360 Post Street, 8th Floor
San Francisco, CA 94108
Telephone: (415) 788-9000
Facsimile: (415) 398-3887

LAW OFFICE OF
MICHAEL D. LIBERTY
Michael D. Liberty (136088)
1290 Howard Avenue, Suite 303
Burlingame, CA 94010
Telephone: (650) 685-8085
Facsimile: (650) 685-8086

AITKEN*AITKEN*COHN
Darren O. Aitken
Casey R. Johnson
3 MacArthur Place, Suite 800
Santa Ana, Ca 92707
Telephone: (714) 434-1424
Facsimile: (714) 434-3600

*Attorneys for Plaintiffs and Members of Plaintiffs' Executive Committee*

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY, LLP

**THIRD AMENDED CONSOLIDATED COMPLAINT**

62

# EXHIBIT 1



## THE BANK OF NEW YORK MELLON

June 2, 2009

**Medical Provider Financial Corporation IV**
**Series II Secured Notes (the "Series II Notes")**

### NOTICE TO SERIES II NOTEHOLDERS

The Bank of New York Mellon is the Trustee under the Note Issuance and Security Agreement dated as of October 23, 2006, as supplemented and amended by the First Supplemental Note Issuance and Security Agreement dated as of May 2, 2007 (the "Note **Issuance Agreement**") by and between Medical Provider Financial Corporation IV ("**MedCap IV**") and The Bank of New York Mellon, as Trustee (the "Trustee"). Capitalized terms used in this Notice that are not otherwise defined have the meanings provided in the Note Issuance Agreement.

On May 18, 2009 the Trustee provided information to holders of the Series II Notes (the "**Series II Noteholders**") about defaults on the Series II Notes. The Trustee's presentation included answers to questions that the Series II Noteholders had asked the Trustee to address that are of interest to the Series II Noteholders as a group.

This Notice provides you with:

- A summary of the Trustee's May 18, 2009 presentation to the Series II Noteholders (with some supplemental information), and

- A form to use if you would like to share your contact information and communicate directly with other Series II Noteholders.

*The information in this notice relates only to the MedCap IV Series II Notes. It does not relate to the MedCap IV Series I Notes or to other transactions entered into by Medical Capital Corporation or any related party.*

While the questions that the Series II Noteholders asked the Trustee to address took different forms, they generally covered the following topics:

- Requests for information about the defaults on the Series II Notes.

- Questions about the assets available to repay the Series II Notes and the value of those assets, as well as the likely timing and amount of payments on the Series II Notes.

- Questions about the role of the Trustee and reimbursement of the Trustee's fees and expenses.

Page 1

- Requests that the Trustee describe the remedies available to the Trustee and the actions the Trustee has taken and expects to take in the future. In particular, holders have asked about acceleration of the Series II Notes and actions the Trustee may take to collect or liquidate the collateral for the Series II Notes.

- Questions about actions that individual Series II Noteholders can take in response to the defaults on the Series II Notes.

While MedCap IV also made a presentation to the Series II Noteholders on May 18, 2009, the Trustee is not summarizing MedCap IV's presentation. The Trustee is not responsible for the information that MedCap IV provides to the Series II Noteholders. The Trustee had planned to record the May 18, 2009 presentation and make the recording available to all Series II Noteholders. However, MedCap IV did not consent to recording its presentation, so the Trustee was not able to do so.

The Trustee has been informed that MedCap IV has distributed information discussing the default on the Series II Notes, the collateral that is the expected source of repayment of the Series II Notes and related matters. MedCap IV has provided the Trustee with copies of some of the communications we understand have been distributed to Series II Noteholders and has indicated that it will provide any other communications that the Trustee has not yet received. We have requested that MedCap IV provide us on a current basis with all information that is distributed by MedCap IV or on its behalf relating to the defaults on the Series II Notes, the collateral for the notes and related matters.

The Trustee has had discussions with MedCap IV regarding the defaults on the Series II Notes and how MedCap IV plans to deal with them. The Trustee has received information from MedCap IV about the collateral for the Series II Notes, the amounts due on the notes and plans to collect on or liquidate the collateral for the Series II Notes to produce funds to pay amounts due on the Series II Notes. The Trustee has requested more information from MedCap IV about the collateral for the Series II Notes and other assets that are the expected source of repayment of the Series II Notes, which the Trustee has not yet received. Our discussions with MedCap IV are continuing.

Some of the information that the Trustee provided to the Series II Noteholders on the call was received from MedCap IV. While the Trustee believes the information it is providing is materially correct, there is other information that the Trustee has requested from MedCap IV that it has not yet received. Present circumstances may change, or additional information received from MedCap IV or other sources, may change the information the Trustee presented to the Series II Noteholders on May 18, 2009 and in this notice.

## 1. Role of the Trustee and its Advisers

The Bank of New York Mellon is a New York chartered bank that is authorized to exercise corporate trust powers and is regulated by New York State and by United States federal government agencies.

The Trustee acts for the Series II Noteholders as a group under the Note Issuance Agreement. The role of the Trustee is to protect the interest of the Series II Noteholders. The Trustee is not related to MedCap IV or Medical Capital Corporation, and therefore will exercise independent judgment in fulfilling its responsibilities. The Trustee will communicate to the Series II Noteholders when a payment default has occurred on the Series II Notes and when other important events occur. The Trustee has the right to enforce the Note Issuance Agreement against MedCap IV and the right to take action to collect or sell the collateral for the Series II Notes. The Note Issuance Agreement also gives MedCap IV certain rights that the Trustee is required to recognize.

The Trustee retains advisers to provide legal and financial advice about the courses of action available to the Trustee for the benefit of the Series II Noteholders. The Trustee has retained counsel and expects to retain a financial adviser to assist in evaluating the default on the Series II Notes, the collateral for the Series II Notes and the actions that the Trustee should take.

## 2. Series II Notes

Approximately $152 million in principal amount of Series II Notes is currently outstanding. In addition, there is approximately $5.4 million of interest that is due and unpaid on the Series II Notes. The amount of interest due and unpaid may change. The Series II Notes were issued with 3, 5 or 7 year terms, and have differing maturity dates based on the date a specific note was issued. The Series II Notes pay interest monthly, quarterly, annually or only at maturity, depending on the terms of a specific Series II Note. The Series II Notes bear interest at between 1.5% and 2% over the prime rate with minimum annual interest rates of between 9.75% and 10.25% depending on the 3, 5 or 7 year term of the Series II Note. There are approximately 1,400 Series II Noteholders. The Series II Notes were issued beginning in 2007, and none of these notes have matured. The Event of Default that has occurred on the Series II Notes resulted from MedCap IV's failure to pay interest when due on its notes.

The Note Issuance Agreement provides that available funds (after payment of the Trustee's fees and expenses) are applied to pay amounts due on the Series II Notes in the order that they become due – first to pay interest that is then due and payable on the Series II Notes and then to pay any principal that is then due and payable on the Series II Notes. If the Series II Notes are accelerated then the available funds (after payment of the Trustee's fees and expenses and other specified expenses) are applied to pay outstanding obligations *pro rata* – the funds are applied to unpaid interest and any remaining funds are applied to pay principal of the Series II Notes regardless of their original maturity date.

The terms of the Series II Notes do not require Medical Capital Corporation or anyone else other than MedCap IV to repay the Series II Notes. The only collateral for the Series II Notes is a specifically designated pool of assets owned by MedCap IV. When the term "collateral" is used in this summary, it means the pool of assets owned by MedCap IV that are the expected source of repayment of the Series II Notes. MedCap IV has other assets, but those assets are not expected to be a source of repayment for the Series II Notes. The Series II Notes are not obligations of the Trustee, and the Trustee holds only a small amount of funds in connection with the Series II Notes.

The Trustee has been asked by Series II Noteholders if their Series II Notes are fully secured and if they will receive payment of all of their principal and interest. It is not at all clear at this time whether the collateral for the Series II Notes will ultimately generate enough cash to fully repay the Series II Notes.

Under the terms of the Series II Notes, MedCap IV maintains the list of the Series II Noteholders and maintains all records of the amounts that have been paid and the principal and interest that is due on each note. MedCap IV also provides the information regarding payments to be made on the Series II Notes. Payments on the Series II Notes are made by MedCap IV or by a third party that works for MedCap IV. In essence, MedCap IV is the registrar and paying agent for the Series II Notes under the terms of the Note Issuance Agreement.

## 3. MedCap IV's Assets

MedCap IV's business consists of borrowing funds through selling its notes to investors – that is to the Series II Noteholders – and using the funds to make investments. MedCap IV also issued Series I Notes, but those notes are separate obligations and secured by different collateral from the Series II Notes. The collateral for

Page 3

the Series II Notes represents the portion of MedCap IV's assets that is the expected source of repayment for the Series II Notes.

Under the terms of the Series II Notes, MedCap IV was permitted to use the funds that it borrowed from the Series II Noteholders to invest in short-term healthcare accounts receivable, in longer term loans to healthcare-related companies and in other types of assets described in the Note Issuance Agreement. Based on the information provided to the Trustee by MedCap IV, the collateral for the Series II Notes currently consists primarily of short-term healthcare receivables and loans made to healthcare providers secured by real estate and other assets. The collateral also includes an equity investment in a company that is not involved in the healthcare industry as well as other assets. The Trustee is continuing to make follow up inquiries of MedCap IV about these assets.

MedCap IV has advised the Trustee that it is having difficulty collecting payments on most of the collateral. In the case of loans, most of the borrowers are in financial difficulty or are otherwise unable to pay their obligations on a current basis. Some of the borrowers are in bankruptcy, and others are involved in workouts. In the case of the short-term receivables included in the collateral, many of the receivables are the subject of lawsuits that could affect the amount and timing of the collection of those receivables. Payments are not being made on the collateral for the Series II Notes and as a result funds have not been available to make the interest payments due on the Series II Notes in full when due.

MedCap IV has indicated to the Trustee that it is pursuing collection and foreclosure efforts on the collateral for the Series II Notes. MedCap IV has indicated that it is seeking purchasers for some of the collateral, but has not described any specific proposals that are presently under consideration.

The information that the Trustee has received from MedCap IV indicates that there may be significant risks that the collateral will not be collected or otherwise liquidated at its full face amount and that there may be significant delays in obtaining funds. Based on the information provided to the Trustee by MedCap IV at this time, the Trustee cannot determine when funds will be available to make payments on the Series II Notes, how much will be realized through collection or other liquidation of the collateral or whether the collections and other recoveries on the collateral will be enough to pay the Series II Notes in full.

The Trustee will need more information, which we will review with our counsel and a financial adviser to be hired, in order to evaluate the timing and amount of recoveries on the collateral and MedCap IV's ability to pay the Series II Notes.

Furthermore, any information the Trustee is able to develop with regard to the Collateral will be subject to inherent uncertainty because of the legal and other factors affecting the payment obligations and the other assets that make up the collateral for the Series II Notes.

The Trustee, together with our counsel and financial adviser, will be evaluating MedCap IV's proposals for collecting amounts due on the collateral, as well as whether there are other alternatives available that would produce a better result for the Series II Noteholders. In the current economic conditions, a sale of all or part of the collateral may be at low prices. Even if sales are delayed until the economy as a whole improves, however, there is no assurance that the collateral can be sold for its full face amount or what percentage of the full face amount could be obtained after the expenses of a sale. Some of the collateral may not be saleable at all. The Series II Noteholders might or might not see a better recovery if efforts to collect the amounts payable on the collateral for the Series II Notes are continued.

### 4. Remedies Available to the Trustee

The collateral consists primarily of payment obligations from third parties and some other assets that are not liquid. At the present time, MedCap IV is handling the process of enforcing the payment obligations and otherwise liquidating the collateral, and the Trustee will monitor those efforts. The Trustee has requested that MedCap IV make sure that the cash flow generated by the collateral for the Series II Notes is paid into accounts that are controlled by the Trustee. If the Trustee determines, in consultation with its advisers, that MedCap IV's collection efforts are not reasonable or that there are other reasons to remove MedCap IV from the collection efforts and control of the collateral, the Trustee will evaluate and determine the best means to effect that change.

Series II Noteholders have also asked if the Trustee will foreclose on the collateral for the Series II Notes. The Trustee is reviewing this option with its advisers and will continue to do so. A foreclosure in which the Trustee seeks a cash buyer for some of the collateral is a possibility. Before proceeding with this alternative, the Trustee needs to consider that a liquidation through a foreclosure could result in low sale prices that might not produce as much of a recovery as making efforts to collect the amounts due on the collateral.

The Trustee is monitoring the situation, and will continue to discuss it with MedCap IV. The Trustee will also obtain advice from our counsel and financial adviser. If there is a benefit to taking further actions with respect to the collateral, then the Trustee will pursue its available legal remedies for the benefit of the Series II Noteholders.

Series II Noteholders have asked, and the Trustee has begun to consider, whether the Series II Notes should be accelerated. An acceleration would change the noteholders' legal rights to payment, by making all amounts on all of the Series II Notes currently due and payable. However, an acceleration does not produce cash that can be used to make payments, and payments will still only be made as the collateral for the Series II Notes is liquidated, through collecting amounts due on assets like the accounts receivable and loans and through sales of assets. The Trustee and its advisers will continue to monitor the amounts due on the Series II Notes and the expected recovery from the collateral and evaluate whether the Series II Notes should be accelerated.

An important consideration for the Trustee and the Series II Noteholders is the costs incurred by the Trustee and its counsel and other advisers. While MedCap IV is obligated to pay the Trustee's and its advisers' fees and costs, MedCap IV has only limited assets and sources of cash to make those payments. These fees and costs will reduce the cash MedCap IV will have available to make payments on the Series II Notes.

The Trustee charges an annual base fee for routine administration of the Series II Notes. After a default occurs, the Trustee is reimbursed for the additional costs and expenses that result from the default. The Trustee does not charge a fixed or annual fee for default administration. The Trustee charges an hourly rate for its default administration personnel that administer the Series II Notes, but does not charge for the time of its in-house legal personnel that are involved. The amount of the Trustee's fee and the fees of its advisers are generally based on the amount of time they devote to the Series II Notes. Costs will include mailing of notices to Series II Noteholders, conference calls for the Series II Noteholders and the costs of outside professionals. The Trustee takes these fees and costs into account when deciding whether to retain professionals, how to administer the Series II Notes and whether the Trustee should remove MedCap IV and related entities from dealing with the collateral for the Series II Notes by pursuing remedies available to the Trustee.

## 5. *Series II Noteholder Remedies; Your Note as Evidence of Your Investment in MedCap IV*

The Trustee has received requests from Series II Noteholders to discuss what individual rights or remedies holders can pursue to recover amounts due on their Series II Notes.

The Trustee does not provide investment or legal advice or other advice to individual noteholders. You should consult your own legal and financial advisers if you have questions about your right to take action individually and the terms of the Series II Notes and other note documents. In general, you should consult your own advisers about the value of your investment and other questions about your individual situation.

Under the Note Issuance Agreement, holders of a majority in principal amount of the Series II Notes can direct the Trustee to accelerate the Series II Notes and to pursue certain remedies against MedCap IV. In addition, the Note Issuance Agreement provides that holders of Series II Notes may pursue individual remedies if the Trustee has received a written request from holders of at least 25% in principal amount of the Series II Notes to pursue remedies, the Trustee has been offered indemnification satisfactory to the Trustee to cover its costs, expenses and liabilities to be incurred in complying with such request, the Trustee has not acted on the request from the required percentage of the holders and other requirements specified in the Note Issuance Agreement have been met. The Trustee has not received such a direction or request.

Even if the Trustee accelerates the Series II Notes, and even if the collateral for the Series II Notes is liquidated, there may not be sufficient assets in MedCap IV to repay all of the amounts due on the Series II Notes.

Your Series II Note is the only evidence that you have that you have made an investment in the MedCap IV Series II Notes. The Trustee does not maintain records of the Series II Notes that have been issued or amounts unpaid. Under the terms of the Note Issuance Agreement, the Trustee must rely on MedCap IV for this information. You should contact your own advisers to discuss whether you should surrender your Series II Note to MedCap IV and any steps you should take before doing so.

## 6. *Trustee and Series II Noteholder Communication*

*Communications from the Trustee*: The Trustee intends to keep Series II Noteholders informed of important developments and decisions. The Trustee plans to send periodic notices by first-class mail to Series II Noteholders of record as shown on the Note Register maintained by MedCap IV.

If you have questions about your Series II Notes, you should send them to the Trustee using the contact information provided below. Information about questions of interest to the Series II Noteholders as a group, as well as updates on the Trustee's efforts to resolve the defaults on the Series II Notes, will be communicated to all Series II Noteholders in future notices from the Trustee. Generally, the Trustee will not be able to respond to inquiries from individual Series II Noteholders or their advisers.

If you wish your financial adviser, attorney or other adviser to have this notice or other information that you receive from the Trustee, please feel free to forward the information to them.

Some of the Series II Noteholders have requested that the Trustee include individual holder's advisers in communications from the Trustee. The Trustee believes that the Series II Noteholders should be the parties communicating with their individual advisers. This allows Series II Noteholders to decide what they want to discuss with their advisers, and what costs they want to incur. It also means that Series II Noteholders who do not involve an adviser will not bear costs associated with the Trustee's including advisers to other Noteholders in communications. The Trustee believe this approach is fairest to the Series II Noteholders as a group.

*Updating Your Contact Information:*  The Trustee will generally rely on a mailing list of Series II Noteholders that is provided by MedCap IV.  You should provide any corrections or changes to your contact information directly to MedCap IV so that the mailing list used by the Trustee is current and accurate.

*Communication with Other Noteholders:*  The Trustee will assist Series II Noteholders who want to share their contact information so that they can be contacted by other Series II Noteholders.  The Note Issuance Agreement does not include a consent for the Trustee to release Noteholders' contact information.  The Trustee recognizes that not all Noteholders may want to share their personal information.

Included with this Notice is a consent form that you can complete, sign and return to the Trustee if you would like to share your contact information with other Series II Noteholders.  Please read the form carefully before you decide whether to consent to release of your personal information.  **The deadline for returning forms to the Trustee is June 19, 2009.**  The Trustee will compile a list of contact information received by June 19, 2009 that Series II Noteholders have authorized the Trustee to release.  Only Series II Noteholders that authorize the release of their own contact information, and agree to use that information only for the purpose of communicating with other Series II Noteholders, will receive that list.  Because of the administrative costs and other expenses involved, the Trustee does not expect to update the list after it has been prepared, and you should take that into account in deciding whether to participate by the June 19, 2009 deadline.

**If you do not want to release your personal information to other Series II Noteholders please do not return the form to the Trustee.  You are not required to consent and if you do not consent there will be no change in your rights as a Series II Noteholder under the terms of your Series II Note and the Note Issuance Agreement.**

*Communications to the Trustee:*  Communications to the Trustee from Series II Noteholders can be sent to the Trustee by mail at The Bank of New York Mellon, Default Administration, Corporate Trust Administration, 101 Barclay Street, New York, New York  10286 (Attention: Stuart Rothenberg), by telecopy to (732) 667-9465, or by email to medcap@bnymellon.com.  The Trustee's Bondholder Relations Group can also be reached at 1-800-254-2826.

> THE BANK OF NEW YORK MELLON,
> not in its individual capacity
> but solely as Trustee under the Note Issuance Agreement
> with respect to the Series II Notes

Enclosure:  Consent Form (Consent to Release of Personal Information)

cc:      Medical Provider Financial Corporation IV

Page 7

# EXHIBIT 2

NO. 2008-30286-211



MEDICAL PROVIDER FINANCIAL
CORPORATION III

    Plaintiff,

v.

DARREN BROWN,

    Defendant.

§
§
§
§
§
§
§
§
§
§
§
§

IN THE DISTRICT COURT

DENTON COUNTY, TEXAS

211 JUDICIAL DISTRICT

## TEMPORARY RESTRAINING ORDER

On this 19th day of September, 2008, came on to be heard the application of Plaintiff Medical Provider Financial Corporation III ("Plaintiff") for a temporary restraining order;

Plaintiff appeared before the Court by and through its attorneys of record;

Counsel for Plaintiff represented that Defendant Darren Brown ("Brown") may be represented by Shanna Nugent of David, Goodman & Madole, P.C., 5420 LBJ Freeway, Suite 1200, Dallas, TX 75240, (972)-991-0889, as transactional counsel in the matter made the basis of the suit in which the relief is sought and that Plaintiff provided Defendant's counsel with notice that Plaintiff was seeking this Order prior to the hearing;

The Court considered "Plaintiff's Original Petition and Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction," which was supported, in pertinent part, by documents filed contemporaneously with the Petition and Application;

From the facts set forth in the petition and supporting documentation, it appears to the Court that plaintiff is entitled to a temporary restraining order in that unless you are ordered to immediately cease the acts described below you will commit the acts before notice can be given and

REC-WAV016229