1  JOEL A. FEUER, SBN 100663
2  JFeuer@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
3  2029 Century Park East, Suite 4000
4  Los Angeles, California 90067
   Telephone: (310) 552-8500
5  Facsimile: (310) 551-8741
6  [Additional Counsel Listed on Signature Page]

7  Attorneys for Defendant/Third-Party Plaintiff
   THE BANK OF NEW YORK MELLON

8
9              UNITED STATES DISTRICT COURT

10     CENTRAL DISTRICT OF CALIFORNIA; SOUTHERN DIVISION

11 | IN RE: MEDICAL CAPITAL SECURITIES LITIGATION | CASE NO. ML 10-2145 DOC (RNBx) |

12 | This document relates to:
13 | CASE NO. SACV09-1048 DOC (RNBx)
14 | STEVEN MASONEK, et al., individually and on behalf of all those similarly situated,
15 |                        Plaintiffs,

16 |                v.                               **THE BANK OF NEW YORK MELLON'S AMENDED THIRD-PARTY COMPLAINT**
17 | WELLS FARGO BANK, NATIONAL ASSOCIATION, and THE BANK OF NEW YORK MELLON,
18 |
19 |                        Defendants.

   | THE BANK OF NEW YORK MELLON,
20 |                        Third-Party Plaintiff,

21 |                v.

22 | CAPITAL FINANCIAL SERVICES, INC., CAPWEST SECURITIES, INC., COMMUNITY BANKERS SECURITIES LLC, CULLUM &
23 | BURKS SECURITIES, INC., NATIONAL SECURITIES CORPORATION, OKOBOJI
24 | FINANCIAL SERVICES INC., SECURITIES AMERICA, INC., SIGNATURE FINANCIAL
25 | GROUP, INC, and WFP SECURITIES CORPORATION,
26 |                        Third-Party Defendants.

27
28

Gibson, Dunn &
Crutcher LLP

---

Defendant/Third-Party Plaintiff The Bank of New York Mellon ("BNYM"), by its attorneys Gibson, Dunn & Crutcher LLP, respectfully alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiffs Steven J. Masonek, Sandra J. Masonek, Robert B. Price, Mary Zahara, Mark Masonek, Joann Hosking, Cynthia Masonek Swanson, Robert H. Ludlow, Jr., on behalf of the Robert H. Ludlow, Jr. Revocable Trust 1999, Peter Braunstein, Ann Braunstein, Michel Rapoport, and Kathleen Darrow (collectively, "Plaintiffs") have filed a putative class action against BNYM and Wells Fargo Bank, National Association ("Wells Fargo"), captioned *Masonek, et al. v. Wells Fargo Bank, National Association, et al.*, 09-1048 (C.D. Cal.) (the "*Masonek* Action").  The *Masonek* Action is a constituent case in *In re Medical Capital Securities Litigation*, No. ML 10-2145 (C.D. Cal.), a multi-district litigation pending before this Court.  On March 1, 2011, Plaintiffs filed their Third Amended Consolidated Complaint For Breach of Contract (the "Third Amended Complaint").  (*See* 10-2145 D.E. 147.)

2.     Plaintiffs seek to recover their alleged losses arising from their purchase of promissory notes (the "Notes") issued by Medical Capital Holdings, Inc. and its affiliates (collectively, "MedCap").  Plaintiffs purport to represent a class of investors who purchased MedCap Notes.  MedCap is now allegedly unable to repay in full the principal and interest due on some of the Notes.

3.     BNYM served as indenture trustee for Notes issued by certain special purpose corporations affiliated with MedCap:  Medical Provider Financial Corporation II ("MP II"), Medical Provider Financial Corporation IV ("MP IV"), and Medical Provider Funding Corporation VI ("MP VI").

4.     Wells Fargo served as indenture trustee for Notes issued by other special purpose corporations affiliated with MedCap:  Medical Provider Financial Corporation III ("MP III"), and Medical Provider Funding Corporation V ("MP V").

5.     The Third-Party Defendants named herein are broker-dealers that marketed and sold certain of the Notes (the "BD Defendants").

2

6.  Plaintiffs allege that certain Notes issued by MP II, MP III, MP IV, MP V, and MP VI are now in default. The putative class in the *Masonek* Action consists of all holders of these allegedly defaulted Notes.

7.  The BD Defendants sold a significant number of these allegedly defaulted Notes to Plaintiffs and members of the putative class in the *Masonek* Action.

8.  The BD Defendants were instrumental links in the chain of distribution of the MedCap Notes.

9.  The BD Defendants were obligated under applicable law to sell the MedCap Notes only to persons: (a) who qualified as "accredited investors" under applicable federal laws and regulations, including, but not limited to, the financial or other requirements for accredited investors established by the Securities and Exchange Commission in Regulation D, 17 C.F.R. §230.501 *et seq.*, promulgated under the Securities Act of 1933; and (b) for whom an investment in the Notes was a suitable investment in light of the investor's circumstances, including, but not limited to, the investor's age, net worth, income, investment experience, investment goals and tolerance for risk of loss. In addition, upon information and belief, each of the BD Defendants entered into a written agreement with the issuer of the MedCap Notes and agreed to offer and sell the Notes only to accredited investors as defined in Regulation D and only to those investors who also met all applicable suitability standards.

10.  Upon information and belief, the BD Defendants breached their obligations to MedCap investors who purchased Notes from the BD Defendants, including Plaintiffs and members of the putative class in the *Masonek* Action, by: (a) selling the Notes to investors for whom the Notes were an unsuitable investment given, *inter alia*, the investors' age, net worth, income, investment experience, investment goals, and/or tolerance for risk of loss; and (b) failing to make proper disclosures to investors regarding the risks of the Notes.

11.  As outlined *infra*, many of the BD Defendants are also defendants in *McCoy, et al. v. Cullum & Burks Securities, et al.*, ML 10-2145 (the "*McCoy* Action"),

3

a constituent case in the *In re Medical Capital Securities Litigation* multi-district
litigation. The *McCoy* Action is a putative class action brought on behalf of certain
investors who purchased MedCap Notes from these BD Defendants. The putative
class in the *McCoy* Action is a subset of the putative class in the *Masonek* Action.
Plaintiffs in the *McCoy* Action have brought causes of action for negligence and for
violations of the federal securities laws.

12.     In addition, as outlined *infra*, hundreds of arbitration proceedings have
been instituted by MedCap investors against certain of the BD Defendants before the
Financial Industry Regulatory Authority ("FINRA"), and some of the BD Defendants
have also been subjects of regulatory inquiries in connection with their sale of MedCap
Notes.

13.     The BD Defendants' wrongful acts and/or omissions caused any harm
allegedly suffered by Plaintiffs or members of the putative class in the *Masonek* Action
who bought Notes from the BD Defendants.

14.     On July 27, 2011, Judge David O. Carter issued an order granting class
certification in the *Masonek* Action. (*See* ML 10-2145 D.E. 240.) BNYM contends that
the certification of any class in the *Masonek* Action is not warranted and does not meet
the requirements of Fed. R. Civ. P. 23. To the extent that this Third-Party Complaint is
directed to purported claims by members of the putative class, such allegations are not
intended to be, and should not be construed to be, admissions that a class is appropriate
or should be certified in the *Masonek* Action. In the event a class is decertified in the
*Masonek* Action, BNYM will seek leave to amend this Third-Party Complaint to
address only the claims of the actual plaintiffs against the appropriate broker-dealer
Third-Party Defendants.

15.     BNYM denies that it is responsible in any manner for any damages
alleged in Plaintiffs' Third Amended Complaint. However, in the event BNYM is held
liable to any Plaintiff or member of the putative class in the *Masonek* Action who
bought Notes from any BD Defendant, BNYM is entitled to indemnity and/or

4

**BNYM'S AMENDED THIRD-PARTY COMPLAINT**

1  contribution from that BD Defendant.

2  ## JURISDICTION AND VENUE

3      16.    This Court has subject matter jurisdiction over this action pursuant to 28

4  U.S.C. § 1367(a).  The claims asserted in this Third-Party Complaint arise out of the

5  same nucleus of operative facts as the claims asserted in the *Masonek* Action, and

6  therefore are so related to the claims asserted in the *Masonek* Action that they form

7  part of the same case or controversy under Article III of the United States Constitution.

8  This Court has original jurisdiction over this action pursuant to the Class Action

9  Fairness Act, 28 U.S.C. § 1332(d)(11).  The amount in controversy exceeds

10  $5,000,000, exclusive of interests and costs, and there is a diversity of citizenship

11  between Plaintiffs and Defendants.

12      17.    This Court also has subject matter jurisdiction over this action pursuant to

13  28 U.S.C. § 1332(a).  There is a diversity of citizenship between BNYM and each of

14  the BD Defendants.  The amount in controversy between BNYM and each BD

15  Defendant exceeds $75,000.

16      18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2).  This

17  District has jurisdiction over the *Masonek* Action; a substantial part of the events, acts,

18  omissions, and transactions complained of occurred in this District; and at all relevant

19  times herein, the BD Defendants conducted substantial business and/or committed

20  violations of law by acts committed in this District.

21  ## PARTIES

22  **A.**    **Third-Party Plaintiff**

23      19.    Defendant/Third-Party Plaintiff BNYM is a New York chartered bank

24  with its principal executive offices and headquarters in New York, New York.

25  **B.**    **Third-Party Defendants**

26      20.    Third-Party Defendant **Capital Financial Services, Inc.** ("Capital

27  Financial") is a Wisconsin corporation with a principal place of business in Minot,

28  North Dakota, and offices throughout the United States, including in the State of

Gibson, Dunn & Crutcher LLP

5

California.

21.     Upon information and belief, Capital Financial sold approximately $10,936,000 of Notes issued by MP II that have subsequently defaulted; approximately $24,454,000 of Notes issued by MP IV, Series I that have subsequently defaulted; approximately $16,050,000 of Notes issued by MP IV, Series II that have subsequently defaulted; and approximately $11,115,798 of Notes issued by MP VI that have subsequently defaulted.

22.     Upon information and belief, Capital Financial sold to residents of the State of California approximately 141 Notes issued by MP II, MP III, MP IV, MP V, and MP VI that have subsequently defaulted, totaling approximately $15,941,000. Capital Financial has been licensed to sell securities in the State of California since 1986 and has a registered agent for service of process in this State.

23.     On or about April 7, 2011, FINRA announced sanctions against Capital Financial's registered representatives Jeffrey Allen Lindsey and Bradley Paul Wells, two members of Capital Financial's New Products Committee, finding that they violated FINRA Rule 2010 and National Association of Securities Dealers ("NASD") Rules 3010 and 2110 by permitting the firm to sell Notes issued by MP VI without conducting appropriate due diligence. (*See Lindsey*, FINRA Letter of Acceptance, Waiver and Consent, No. 2009019125901 (Feb. 23, 2011); *Wells*, FINRA Letter of Acceptance, Waiver and Consent, No. 2009019125902 (Feb. 23, 2011).)

24.     Capital Financial is a defendant in the *McCoy* Action.  Capital Financial has answered the negligence claim alleged against it in the *McCoy* Action.  (*See* ML 10-2145 D.E. 75.)

25.     A number of FINRA arbitration proceedings have been instituted against Capital Financial by MedCap investors. (*Billitteri v. Securities America, Inc., et al.*, 09-1568, (N.D. Tex. 2011), D.E. 320-1, at 8–45.)

26.     Third-Party Defendant **CapWest Securities, Inc.** ("CapWest") is a Colorado corporation with a principal place of business in Lakewood, Colorado, and

6

offices throughout the United States, including in the State of California.

27.     Upon information and belief, CapWest sold approximately $5,684,000 of Notes issued by MP II that have subsequently defaulted; approximately $12,460,000 of Notes issued by MP IV, Series I that have subsequently defaulted; and approximately $12,393,000 of Notes issued by MP IV, Series II that have subsequently defaulted.

28.     Upon information and belief, CapWest sold to residents of the State of California approximately 117 Notes issued by MP II, MP III, MP IV, and MP V that have subsequently defaulted, totaling approximately $14,322,000. CapWest has been licensed to sell securities in the State of California since 1994 and has a registered agent for service of process in this State.

29.     CapWest is a defendant in the *McCoy* Action. CapWest has answered the negligence claim alleged against it in the *McCoy* Action. (*See* ML 10-2145 D.E. 84.)

30.     Third-Party Defendant **Community Bankers Securities, LLC** ("Community Bankers") is a Colorado corporation with a principal place of business in Richmond, Virginia, and offices throughout the United States.

31.     Upon information and belief, Community Bankers sold approximately $4,044,000 of Notes issued by MP II that have subsequently defaulted; approximately $13,088,000 of Notes issued by MP IV, Series I that have subsequently defaulted; approximately $6,540,000 of Notes issued by MP IV, Series II that have subsequently defaulted; and approximately $6,787,000 of Notes issued by MP VI that have subsequently defaulted.

32.     Upon information and belief, Community Bankers sold to residents of the State of California approximately 11 MedCap Notes issued by MP II, MP IV, MP V, and MP VI that have subsequently defaulted, totaling approximately $676,000.

33.     On or about January 19, 2011, a FINRA arbitration panel found Community Bankers culpable to an investor who had purchased a MedCap Note from Community Bankers representative John Guyette. The investor had brought causes of action for (1) unsuitability; and (2) negligence, misrepresentation, concealment, and

7

breach of fiduciary duty. The FINRA panel awarded over $700,000 in damages, including compensatory damages, attorneys' fees, and interest. (*See Casson v. Community Bankers Securities, LLC*, FINRA Arb. No. 09-06444 (Jan. 19, 2011).)

34. Third-Party Defendant **Cullum & Burks Securities, Inc.** ("Cullum & Burks") is a Texas corporation with a principal place of business in Dallas, Texas, and offices throughout the United States, including in the State of California.

35. Upon information and belief, Cullum & Burks sold approximately $301,000 of Notes issued by MP II that have subsequently defaulted; approximately $3,897,000 of Notes issued by MP IV, Series I that have subsequently defaulted; approximately $567,000 of Notes issued by MP IV, Series II that have subsequently defaulted; and approximately $2,946,000 of Notes issued by MP VI that have subsequently defaulted.

36. Upon information and belief, Cullum & Burks sold to residents of the State of California approximately 89 Notes issued by MP II, MP III, MP IV, MP V, and MP VI that have subsequently defaulted, totaling approximately $6,876,000.

37. Cullum & Burks is a defendant in the *McCoy* Action. Cullum & Burks has answered the negligence claim alleged against it in the *McCoy* Action. (*See* ML 10-2145 D.E. 65.)

38. On or about April 7, 2011, FINRA announced sanctions against Cullum & Burks' registered principals Timothy Cullum and Steven Burks, finding that they violated FINRA Rule 2010 and NASD Rules 3010 and 2110 by permitting the firm to sell Notes issued by MP VI without conducting appropriate due diligence. (*See* FINRA Letter of Acceptance, Waiver and Consent, No. 20090118818001 (Feb. 15, 2011).)

39. Third-Party Defendant **National Securities Corp.** ("National Securities") is a Washington corporation with principal places of business in Seattle, Washington, and New York, New York, and offices throughout the United States, including in the State of California.

8

40. Upon information and belief, National Securities sold approximately $1,370,000 of Notes issued by MP II that have subsequently defaulted; approximately $7,018,000 of Notes issued by MP IV, Series I that have subsequently defaulted; approximately $4,264,000 of Notes issued by MP IV, Series II that have subsequently defaulted; and approximately $7,371,250 of Notes issued by MP VI that have subsequently defaulted.

41. Upon information and belief, National Securities sold to residents of the State of California approximately 184 Notes issued by MP II, MP III, MP IV, MP V, and MP VI that have subsequently defaulted, totaling approximately $20,735,000. National Securities has been licensed to sell securities in the State of California since 1981 and has a registered agent for service of process in this State.

42. National Securities is a defendant in the *McCoy* Action. National Securities has answered the negligence claim alleged against it in the *McCoy* Action. (*See* ML 10-2145 D.E. 68.)

43. Third-Party Defendant **Okoboji Financial Services, Inc.** ("Okoboji") is an Iowa corporation with a principal place of business in Okoboji, Iowa, and offices throughout the United States.

44. Upon information and belief, Okoboji sold approximately $2,224,000 of Notes issued by MP II that have subsequently defaulted; approximately $9,090,000 of Notes issued by MP IV, Series I that have subsequently defaulted; and approximately $5,074,000 of Notes issued by MP IV, Series II that have subsequently defaulted.

45. Upon information and belief, Okoboji sold to residents of the State of California approximately six Notes issued by MP IV and MP V that have subsequently defaulted, totaling approximately $435,000.

46. On or about March 7, 2011, a FINRA arbitration panel found Okoboji culpable for negligent misrepresentation and other violations against noteholders who purchased MP V Notes and another private placement offering from Okoboji. The FINRA panel awarded the noteholders approximately $300,000 in compensatory

9

Gibson, Dunn &
Crutcher LLP

damages.  (*See Husman v. Okoboji Financial Services, Inc.*, FINRA Arb. No. 09-06559 (Mar. 7, 2011).)

47.     Okoboji is a defendant in *Barber, et al. v. Okoboji Fin. Serv., Inc.*, No. 10-4034 (D.S.D.), an action brought by a Medical Capital Noteholder alleging breach of fiduciary duty, violations of FINRA rules of conduct, and violations of state and federal securities laws.

48.     Third-Party Defendant **Securities America, Inc.** ("Securities America") is a Delaware corporation with a principal place of business in La Vista, Nebraska, and offices throughout the United States, including in the State of California.

49.     Upon information and belief, Securities America sold approximately $11,894,000 of Notes issued by MP II that have subsequently defaulted; approximately $61,575,000 of Notes issued by MP IV, Series I that have subsequently defaulted; approximately $62,147,000 of Notes issued by MP IV, Series II that have subsequently defaulted; and approximately $100,000 of Notes issued by MP VI that have subsequently defaulted.

50.     Upon information and belief, Securities America sold to residents of the State of California approximately 676 Notes issued by MP II, MP III, MP IV, and MP V that have subsequently defaulted, totaling approximately $64,153,000.  Securities America has been licensed to sell securities in the State of California since 1984 and has a registered agent for service of process in this State.

51.     On or about January 26, 2010, the Secretary of the Commonwealth of Massachusetts, Securities Division (the "Massachusetts Securities Division") filed an Administrative Complaint against Securities America, claiming that it violated the antifraud provision of Massachusetts Securities Laws and NASD Interpretive Material 2310-2, and rules 2110, 2120, and 2210, which are incorporated in the state statutes. (*See* Complaint, *In re Securities America*, No. 2009-0085 (Mass. Sec. Div. Jan. 26, 2010).)  The Massachusetts Securities Division alleged that Securities America failed to conduct proper due diligence and misled customers in the sale of MedCap Notes.

10

An administrative hearing took place throughout the fall and winter of 2010.

52.     On May 23, 2011, Securities America entered into a Consent Order with the Massachusetts Securities Division settling the regulatory action against it. Securities America agreed to make restitution to each investor in Massachusetts who purchased Notes from Securities America. The Consent Order reaches the legal conclusion that Securities America made unsuitable recommendations of securities to investors concerning MedCap Notes. (*See* Consent Order, *In re Securities America, No. 2009-0085* (Mass. Sec. Div. May 23, 2011, at ¶ 78). While Securities America neither admitted nor denied the conclusions, the order noted that many Massachusetts investors were unsophisticated and relied on their broker to explain to them the structure of the notes.  Many of these investors had the false impression that the MedCap Notes were low-risk investments.

53.     On or about August 4, 2010, the Commissioner of Securities and Insurance of the State of Montana filed a Notice of Proposed Agency Disciplinary Action against Securities America, claiming that it and certain agents violated the Securities Act of Montana.  The Commissioner alleged that Securities America failed to conduct proper due diligence and misled customers in the sale of MedCap Notes. (*See* Notice of Proposed Agency Disciplinary Action & Opportunity for Hearing, *In re Securities America, Inc.*, No. SEC-2010-48 (Mont. Comm'r of Sec. & Ins. Aug. 4, 2010).)

54.     Upon information and belief, over 250 FINRA arbitration proceedings have been instituted against Securities America by MedCap investors.

55.     On or about December 31, 2010, a FINRA arbitration panel found Securities America culpable of negligence and other violations against a noteholder who purchased a MedCap Note from Securities America representative Randall Ray Talbott.  The FINRA panel found that Securities America was liable for approximately $1,200,000 in compensatory damages, punitive damages, and attorneys' fees and costs. (*See Wayman v. Securities America, Inc.*, FINRA Arb. No. 10-00012 (Dec. 31, 2010).)

11

56.     Securities America is a defendant in the *McCoy* Action.  It was also named as a defendant in *Grossbard, et al. v. Securities America Financial Corporation, et al.*, SACV 10-478 (the "*Grossbard* Action").  In the *Grossbard* Action, this Court determined that plaintiffs stated a claim for negligence against Securities America.  (*See* ML 10-2145 D.E. 52.)  Plaintiffs in the *Grossbard* Action and the *McCoy* Action have filed a consolidated complaint.  (*See* ML 10-2145 D.E. 61).

57.     On July 27, 2011, Judge Royal Furgeson of the Northern District of Texas noted that his final approval of a settlement between Securities America and a proposed class of Plaintiffs who purchased MP I, II, III, IV, and V notes from Securities America would be forthcoming.  Several persons who purchased MP II and MP IV Notes from Securities America opted out of that settlement.  Further, at least several dozen noteholders opted out of the class action settlement to pursue arbitration claims, the majority of which have also been settled in a group settlement.  To the extent that the settlements bar claims of contribution and indemnity against Securities America, this Complaint only seeks indemnity with regard to purchasers of MedCap Notes who have not settled with Securities America.  BNYM is informed and believes and thereon alleges that some of the Noteholders who opted out from the settlement are members of the putative class in this case against BNYM.

58.     Third-Party Defendant **Signature Financial Group, Inc.** ("Signature Financial") is a Missouri corporation with a principal place of business in Torrance, California.

59.     Upon information and belief, Signature Financial sold approximately $4,112,000 of Notes issued by MP II that have subsequently defaulted; approximately $6,103,000 of Notes issued by MP IV, Series I that have subsequently defaulted; approximately $2,038,000 of Notes issued by MP IV, Series II that have subsequently defaulted; and approximately $6,085,000 of Notes issued by MP VI that have subsequently defaulted.

12

60.   Upon information and belief, Signature Financial sold to residents of the State of California approximately 128 Notes issued by MP II, MP III, MP IV, MP V, and MP VI that have subsequently defaulted, totaling approximately $19,193,000. Signature Financial has a registered agent for service of process in this State.

61.   Third-Party Defendant **WFP Securities Corp.** ("WFP") is a California corporation with a principal place of business in San Diego, California.

62.   Upon information and belief, WFP sold approximately $5,136,000 of Notes issued by MP II that have subsequently defaulted; approximately $5,442,000 of Notes issued by MP IV, Series I that have subsequently defaulted; and approximately $5,966,000 of Notes issued by MP IV, Series II that have subsequently defaulted.

63.   Upon information and belief, WFP sold to residents of the State of California approximately 325 Notes issued by MP II, MP III, MP IV, MP V, and MP VI that have subsequently defaulted, totaling approximately $27,135,000.  WFP has been licensed to sell securities in the State of California since 1994 and has a registered agent for service of process in this State.

64.   In a filing with the SEC, WFP disclosed that FINRA was conducting an investigation of WFP related to MedCap.

65.   An interpleader complaint filed in the Central District of California alleges that numerous WFP clients have brought claims against it, alleging that WFP failed to investigate and conduct proper due diligence on MedCap Notes and that they made misrepresentations and omissions of material information.  The interpleader complaint lists thirteen pending arbitrations against WFP concerning MedCap Notes. (*See* Complaint in the Nature of Interpleader, *Endurance American Specialty Insurance Co. v. WFP Securities Corp. et al.,* No. CV11-01436 (C.D. Cal. Feb 16, 2011), D.E. 1).

66.   Additionally, noteholder John Sothras sent a demand letter to WFP alleging unsuitable recommendations of MedCap Notes and failure to conduct proper due diligence. (*See id.*)

Gibson, Dunn & Crutcher LLP

## C.   **Non-Parties**

67.    Various non-parties also participated in the wrongdoing alleged by
Plaintiffs in the *Masonek* Action.  Many of these persons and entities, including many
of those described below, have been named as defendants in an action initiated by the
Securities and Exchange Commission in July 2009 (the "SEC Action").  (*See Sec. &
Exch. Comm. v. Medical Capital Holdings, Inc., et al.*, SACV 09-818 (C.D. Cal.), D.E.
185.)  The Court's Permanent Injunction Order (SACV 09-818 D.E. 44), instituted in
connection with the SEC Action, precludes claims against MedCap.  BNYM reserves
the right to seek leave from the Court to amend its Third-Party Complaint at a future
date to add as third-party defendants certain other persons and entities, including
persons and entities affiliated with MedCap, including, but not limited to:

68.    Medical Capital Holdings, Inc. ("MCH"):  MCH is a Nevada corporation
with its principal place of business in Tustin, California.  Through various wholly-
owned operating subsidiaries and special purpose corporations, MCH provided
financing to healthcare providers by purchasing their accounts receivables and making
secured loans to them.  MCH also invested in non-receivable assets, as well as assets
not related to the healthcare industry.  MCH used its special purpose corporations to
raise money from investors to fund the purchase of assets and other lending activity.
MCH used operating subsidiaries to underwrite, monitor, administer, and service the
financing.

69.    Medical Capital Corporation ("MCC"):  MCC is a Nevada corporation
and wholly owned subsidiary of MCH, with its principal place of business in Tustin,
California.  MCC was the administrator for each of MCH's special purpose
corporations—including MP II, MP IV, and MP VI—and provided management,
underwriting, and administrative services, such as bookkeeping, payroll, and
accounting services, including administration of all investor promissory notes and
interest payments.

70.    Sidney M. Field ("Field"):  Upon information and belief, Field is a

14

resident of Villa Park, California.  Field was the CEO and director of MCH and its
subsidiaries during the relevant period.

71.     Joseph J. Lampariello ("Lampariello"):  Upon information and belief,
Lampariello resides in Newport Beach, California.  Lampariello was the president,
COO, and director of MCH and its subsidiaries during the relevant period.

72.     Medical Provider Financial Corporation II:  MP II is a Nevada
corporation and wholly-owned special purpose corporation of MCH that, upon
information and belief, was formed in October 2003.  Upon information and belief,
from January 2004 to December 2005, MP II conducted a Note offering, raising
approximately $251.7 million through the issuance of approximately 3,458 Notes to
investors.

73.     Medical Provider Financial Corporation IV:  MP IV is a Nevada
corporation and wholly-owned special purpose corporation of MCH that, upon
information and belief, was formed in July 2005 and commenced operations in
October 2006.  Upon information and belief, from November 2006 through October
2008, MP IV conducted two series of Note offerings, raising approximately $401.3
million through the issuance of approximately 4,222 Notes to investors.

74.     Medical Provider Funding Corporation VI:  MP VI is a Nevada
corporation and wholly-owned SPC of MCH that, upon information and belief, was
formed in April 2008.  Upon information and belief, from August 2008 to July 2009,
MP VI conducted a Note offering and, as of June 19, 2009, it had raised approximately
$76.9 million through the issuance of approximately 700 Notes to investors.

### STATEMENT OF FACTS

A.     **Background**

1.     **MedCap and Its Issuance of Notes**

75.     MCH and its affiliates invested in medical receivables, made loans and
extended lines of credit to medical and non-medical companies, and invested in real or
personal property.

15

76.     MCH sought to obtain the money to engage in its business by issuing Notes to investors.

77.     MCH did not issue the Notes directly.  Rather, it formed special purpose corporations, which issued the Notes.  These special purpose corporations included MP II, MP III, MP IV, MP V, and MP VI.

78.     The Notes were sold to investors through registered broker-dealers, including the BD Defendants.

79.     The Notes were highly risky investments and each of the MedCap issuers stated that they intended that the Notes would only be purchased by an investor: (a) who qualified as an accredited investor under applicable federal laws and regulations, including, but not limited to, the financial or other requirements for accredited investors established by the Securities and Exchange Commission in Regulation D promulgated under the Securities Act of 1933; and (b) for whom an investment in the Notes was a suitable investment in light of the investor's circumstances, including, but not limited to, the investor's age, net worth, income, investment experience, investment goals and tolerance for risk of loss.

80.     BNYM did not sell, or attempt to sell, any Notes to any investor.

81.     Each series of Notes was to be secured by separate assets, and separate trust accounts were created to hold these assets.

82.     BNYM served as the indenture trustee in connection with the Notes issued by MP II, MP IV, and MP VI.

83.     Wells Fargo served as indenture trustee in connection with the Notes issued by MP III and MP V.

**2.      The Nature and Extent of BNYM's Obligations**

84.     Each series of Notes was accompanied by a Note Issuance and Security Agreement ("NISA"), which defined the nature and extent of any obligations BNYM had in connection with MedCap and the Notes.

85.     As indenture trustee, BNYM's role was essentially limited to maintaining

16

Gibson, Dunn &
Crutcher LLP

the funds in the trust accounts for MP II, MP IV, and MP VI, and periodically releasing funds pursuant to MedCap's instructions.

86.     BNYM was not responsible for investigating or verifying the information contained in MedCap's fund requests.  Nor did BNYM have the duty to supervise the types of assets MedCap purchased or how MedCap accounted for those assets in its books and records.

87.     The NISAs were clear that BNYM "[i]n the absence of bad faith on its part . . . [could] conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee."  The Private Placement Memoranda ("PPMs") issued by MedCap for each Note offering confirmed BNYM's limited function and disclosed that BNYM had no obligation "to monitor, supervise or verify" MedCap's actions and was not "responsible . . . to independently determine any collateral coverage ratios, or to otherwise make any inquiry or investigation or have any responsibility as to whether [the SPC was] in default or had breached any obligation."

88.     Despite this limited role undertaken by BNYM, Plaintiffs seek to hold BNYM liable for the entirety of their investment losses.

89.     BNYM denies the allegations in Plaintiffs' Third Amended Complaint, and hereby incorporates all responses in its Answer to Plaintiffs' Third Amended Complaint (09-1048 D.E. 169) as if fully set forth herein.

**B.     The BD Defendants' Pattern of Wrongful Conduct**

90.     The BD Defendants acted wrongfully in the sale of MedCap Notes by turning a blind eye to their obligations to their own clients, the investors in the Notes, in favor of the easy gain of high commissions paid by MedCap.

91.     Upon information and belief, the BD Defendants: (a) knowingly or negligently marketed, recommended, and sold MedCap Notes to investors for whom the high risk Notes were not a suitable investment in light of the individual investor's age, net worth, income, investment experience, investment goals, and/or tolerance for

17

risk of loss; and (b) knowingly or negligently misrepresented and/or omitted to disclose the risks associated with the MedCap Notes to their clients.

### 1. The BD Defendants Sold the Notes to Investors for Whom the Notes Were Not a Suitable Investment

92. Upon information and belief, the BD Defendants marketed, recommended, and sold MedCap Notes to numerous investors for whom the BD Defendants knew or should have known the Notes were unsuitable investments in light of the individual investor's age, net worth, income, investment experience, investment goals, and/or tolerance for risk of loss.

93. Upon information and belief, these investors included the elderly and retirees, investors with low educational attainment, as well as investors with low risk investment objectives including those who expressly were saving to pay for their children's college tuition expenses or to pay off a mortgage.

94. For example, BD Defendant Okoboji is alleged to have sold MedCap Notes to "an elderly widow of limited finite [*sic*] means with no job or other means of earned income, [who] is substantially dependent on prudent investment of her financial assets with preservation of assets as a key investment objective." (Complaint, *Barber, et al. v. Okoboji Fin. Serv., Inc.*, 10-4034 (D.S.D. 2010), D.E. 1.)

95. BD Defendant Securities America is alleged to have sold MedCap Notes to a 77-year-old investor with Alzheimer's disease, despite requests by the investor's children that Securities America's registered representative not contact the investor directly in light of his deteriorating mental condition. (*Billitteri v. Sec. Am., Inc., et al.*, 09-1568 (N.D. Tex. 2011), D.E. 240, at 52–33.)

96. According to testimony before the Massachusetts Securities Division, Securities America sold MedCap Notes to an investor with no college degree, a $20,000 a year salary, and a net worth of $800,000 to $900,000, which was primarily based on the value of her home and a cottage inherited from her parents. This investor now allegedly lives on Social Security payments.

18

Gibson, Dunn & Crutcher LLP

97.    A FINRA arbitration panel found that BD Defendant Community Bankers was liable to a MedCap investor who alleged the following causes of action: (1) unsuitability; and (2) negligence, misrepresentation, concealment, and breach of fiduciary duty. The FINRA panel awarded over $700,000 in damages to this single investor, including compensatory damages, plus attorneys' fees and interest. (FINRA Case No. 09-06444 (Jan. 19, 2011).)

98.    Kathleen Darrow, a Plaintiff and putative class representative in the *Masonek* Action, initiated a FINRA arbitration proceeding against BD Defendant Signature Financial and the registered representative who sold her MedCap Notes, alleging the Notes were not suitable investments for her in light of her investment objectives. Darrow testified at deposition that she had conservative investment objectives and was not in a position to risk losing her capital and that Signature Financial, via its registered representative Tim Pittman, made material misrepresentations to her concerning the MedCap Notes, including but not limited to misrepresenting their risk, illiquidity, return, and suitability.

99.    Steven J. Masonek, a Plaintiff and putative class representative in the *Masonek* Action, testified at deposition that Andrew Reeves, his registered representative at Signature Financial who recommended and sold MedCap Notes to him, never provided him with a copy of the Private Placement Memoranda for the Notes. He further testified that Mr. Reeves never discussed with him the risks associated with the MedCap Notes. In addition, Mr. Masonek testified that Mr. Reeves may have forged his signature and certain information on his account opening documents, for example by incorrectly inflating his investment experience, net worth and income.

100.   Joann Hosking, a Plaintiff and putative class representative in the *Masonek* Action, testified at deposition that Andrew Reeves, her registered representative at Signature Financial upon whom she relied to help her make financial decisions, told her that the MedCap Notes were "safe" and failed to disclose the risks

19

of the investments.  She further testified that she did not recall reviewing the account
opening documents and questioned whether the signature on the documents was her
real signature. The signature was further suspicious because she noted that Mr. Reeves
had made other transactions separate from MedCap without her knowledge or consent.

101.   By marketing, recommending and selling the Notes to persons who were
not suitable investors for those Notes, the BD Defendants breached their duty of care
to those investors.  The BD Defendants' conduct violated the standards of care
imposed upon broker-dealers engaged in selling private placement offerings such as
the Notes to the public as evidenced by the rules of conduct promulgated by FINRA
and/or the NASD.

102.   To the extent that any Plaintiff or member of the putative class in the
*Masonek* Action purchased MedCap Notes from a BD Defendant and the Notes were
not a suitable investment for the investor in light of the investor's circumstances,
including, but not limited to, the investor's age, net worth, income, investment
experience, investment goals and tolerance for risk of loss, and that Plaintiff or
putative class member suffered damages in connection with the purchase of the
MedCap Notes, those damages were directly and proximately caused by the BD
Defendant's breach of its obligation to only sell the MedCap Notes to persons who
were accredited investors and for whom the MedCap Notes were suitable investments.

**2.      The BD Defendants Made Misrepresentations and/or Omissions
Regarding the Risks of the Notes**

103.   Upon information and belief, the BD Defendants were aware, or should
have been aware, of the risks associated with the Notes, but failed to adequately
disclose those risks to prospective investors.

104.   Upon information and belief, each BD Defendant had access to due
diligence reports commissioned by MedCap in connection with a number of the Note
offerings.  Mick & Associates, P.C., LLO ("Mick & Associates"), a due diligence firm
in Omaha, Nebraska, was engaged by MedCap to provide due diligence reports to

20

broker-dealers who marketed Notes issued by MP III, MP IV, and MP V.

105.   Upon information and belief, many of the BD Defendants received copies of Mick & Associates' due diligence reports.  Those BD Defendants who did not receive copies of the due diligence reports should have obtained copies, or, in the alternative, should have conducted their own due diligence of MedCap and the MedCap Note offerings, in order to comply with their obligations pursuant to rules of conduct promulgated by FINRA and/or the NASD.

106.   Upon information and belief, the reports issued by Mick & Associates for MP III, MP IV, and MP V constituted the primary—and, in some cases, the only— form of due diligence relied upon by the BD Defendants.  For example, Tom Cross, Chairman of Securities America's Due Diligence Committee and Head of Sales, testified at a deposition before the Massachusetts Securities Division that the due diligence analyst reports were the most heavily relied-upon source of information for Securities America in its due diligence process.  Still, the due diligence reports were not, as they ought to have been, an essential component of the BD Defendants' decision to begin marketing MedCap Notes.  In fact, upon information and belief, many of the BD Defendants did not even wait for the reports to be completed before they began selling MedCap Notes.

107.   Mick & Associates' reports highlighted the significant risks associated with the MedCap Notes.  These risks made clear that the Notes were suitable investments only for certain investors, depending on the investor's age, net worth, income, investment experience, investment goals, and tolerance for risk of loss.

108.   Upon information and belief, the BD Defendants failed to disclose the risks associated with the Notes to prospective investors, despite recommendations by Mick & Associates that the BD Defendants provide prospective investors with a copy of Mick & Associates' reports which highlighted these risks.

109.   Further, in 2006, Mick & Associates provided broker-dealers, including at least some of the BD Defendants, with a "Client Disclosure Form," to be sent to

21

Gibson, Dunn &
Crutcher LLP

prospective investors, which was intended to highlight for investors the most significant risks of the Notes.

110.   Upon information and belief, many of the BD Defendants failed to send the Client Disclosure Form to prospective investors.  For example, although Mick & Associates urged Securities America to send the Client Disclosure Form to prospective investors, Securities America failed to do so.

111.   Upon information and belief, by failing to disclose the findings of the due diligence advisors to investors, among other failures, the BD Defendants misrepresented, and/or omitted to describe the nature and extent of, the risks of these investments.

112.   MedCap forbade the BD Defendants from sharing MedCap's financial statements with prospective investors pursuant to nondisclosure agreements.  This arrangement should have raised a red flag about MedCap's business model to each BD Defendant and is representative of the ways that the BD Defendants sold MedCap Notes to investors without providing full disclosure.

113.   Upon information and belief, each prospective investor had the expectation that the BD Defendant from whom it purchased Notes would accurately represent the risks of the investment.  Upon information and belief, each Plaintiff and member of the putative class in the *Masonek* Action who purchased MedCap Notes from a BD Defendant justifiably relied on the respective BD Defendant's misrepresentations and/or omissions.

114.   To the extent that any Plaintiff or member of the putative class in the *Masonek* Action who purchased MedCap Notes from a BD Defendant suffered damages in connection with the MedCap Notes, those damages were directly and proximately caused by the misrepresentations and/or omissions of that BD Defendant.

**3.     The BD Defendants Put their Own Profits Ahead of the Interests of the Investors**

115.   Upon information and belief, the BD Defendants marketed and sold the

22

Notes to investors for whom the Notes were not suitable investments, and misrepresented, and/or omitted to describe the nature and extent of, the risks of the Notes, because they cared only about their commissions and the many perks offered by MedCap.

116.   Upon information and belief, the BD Defendants earned at least $83.7 Million in commissions from the sale of the Notes for MP II, MP III, MP IV, MP V, and MP VI.

117.   Upon information and belief, executives and registered representatives of the BD Defendants who were loyal to MedCap were also treated to lavish, all expenses paid trips to destinations like Las Vegas, Hawaii, Arizona, and Pebble Beach.

118.   For example, in March 2005, MedCap treated several of the BD Defendants to a "conference" in Las Vegas.  MedCap paid for rooms and all-you-can-eat buffets at the Ritz Carlton hotel, golf, gaming tables, poker chips, and $144 massages.  Attendees included:

> a.  Tom Cross (Head of Sales, Securities America)
> b.  Vic Dalfio (Registered Representative, Signature Financial)
> c.  Tom English (Registered Representative, WFP)
> d.  George Gilbert (Registered Representative, Community Bankers)
> e.  Seth Grano (Registered Representative, Community Bankers)
> f.  Jay Idt (VP, Product Distribution, Securities America)
> g.  Robert Jackson (Registered Representative, Capital Financial)
> h.  Kevin Korhorn (Registered Representative, Securities America)
> i.  Michael Lee (Registered Representative, Securities America)
> j.  Pamela Mcclenny (Registered Representative, Capital Financial)
> k.  David Rentz (Registered Representative and Owner, Signature Financial)

119.   Upon information and belief, MedCap provided incentives for broker-dealers to sell MedCap Notes without regard for their suitability for investors.

23

120.    MedCap invited the top 15 sellers of MedCap Notes to join it for its "President's Advisory Council" annual meeting in locations such as Pebble Beach and Scottsdale, Arizona.  Broker-dealers and their registered representatives would receive periodic updates of where they stood in the sales rankings.  MedCap sent entreating emails to its broker-dealers, urging them to sell more and more notes quickly to beat out other registered representatives and win invites to expensive retreats.

121.    For example, in October 2006, MedCap hosted a meeting of the "MedCap Advisory Council" at the Four Seasons Resort in Scottsdale, Arizona. The following persons attended this "Advisory Council" session, which involved golf and spa treatments:

> a.  Larry Bakken (Registered Representative, Capital Financial)
>
> b.  Jay Idt (VP, Product Distribution, Securities America)
>
> c.  Dean Evans (Registered Representative, Securities America)
>
> d.  Michael Lee (Registered Representative, Securities America)
>
> e.  Steven Hoshimi (Registered Representative, Securities America)
>
> f.  John Guyette (Registered Representative, Community Bankers)
>
> g.  Albert Vandelaan (Registered Representative, CapWest)
>
> h.  Cannen Farrell (Registered Representative, Private Asset Group)
>
> i.  Vic Dalfio (Registered Representative, Signature Financial)
>
> j.  Brian Folland (Registered Representative, National Securities)

122.    Induced by high commissions and lavish bonuses, the BD Defendants marketed MedCap Notes to persons who were not suitable investors for the Notes, and knowingly or negligently misrepresented the risks of the Notes to prospective investors.

Gibson, Dunn & Crutcher LLP

## FIRST CLAIM FOR RELIEF

### (Equitable Indemnity)

123.   BNYM realleges and hereby incorporates each and every allegation set forth in Paragraphs 1 through 122 above.

124.   Each BD Defendant is responsible for any and all damages allegedly suffered by those Plaintiffs or putative class members in the *Masonek* Action who purchased the complained-of MedCap Notes from that BD Defendant.

125.   In the event of and to the extent that BNYM is determined to be wholly or partially liable in the *Masonek* Action to any Plaintiff or putative class member who purchased Notes from a BD Defendant, BNYM is entitled to total or partial indemnification from that BD Defendant, on the basis of comparative fault, for any costs, expenses, damages, or other relief incurred by or awarded against BNYM.

## SECOND CLAIM FOR RELIEF

### (Contribution)

126.   BNYM realleges and hereby incorporates each and every allegation set forth in Paragraphs 1 through 122 above.

127.   Each BD Defendant is responsible for any and all damages allegedly suffered by those Plaintiffs or putative class members in the *Masonek* Action who purchased the complained-of MedCap Notes from that BD Defendant.

128.   In the event of and to the extent that BNYM is determined to be wholly or partially liable in the *Masonek* Action to any Plaintiff or putative class member who purchased Notes from a BD Defendant, BNYM is entitled to total or partial contribution from that BD Defendant, on the basis of comparative fault, for any costs, expenses, damages, or other relief incurred by or awarded against BNYM.

## PRAYER FOR RELIEF

WHEREFORE, BNYM prays as follows:

1.   That, in the event judgment is entered against BNYM in the *Msaonek* Action as to any Plaintiff or putative class member who purchased Notes

25

Gibson, Dunn & Crutcher LLP

1  from a BD Defendant, BNYM is entitled to total or partial indemnity and/or

2  contribution from that BD Defendant, on the basis of comparative fault, for any costs,

3  expenses, damages, or other relief incurred or awarded against BNYM.

4         2.    That BNYM be awarded costs of suit incurred in defense of

5  Plaintiffs' Third Amended Complaint (and any previous and future amendments to

6  Plaintiffs' pleadings), cross-claims, and in prosecution of these third-party claims.

7         3.    For such other and further relief as the Court may deem just and

8  proper.

9  Dated: August 1, 2011            GIBSON, DUNN & CRUTCHER LLP

10

11  By: _Joel A. Feuer_

12                  Joel A. Feuer

13  JOEL A. FEUER, SBN 100663
    TIMOTHY W. LOOSE, SBN 241037
14  2029 Century Park East, Suite 4000
    Los Angeles, California 90067
15  Telephone: (310) 552-8500
    Facsimile: (310) 551-8741
16

17  MARK A. KIRSCH, admitted *pro hac vice*
    JOEL M. COHEN, admitted *pro hac vice*
18  LADAN F. STEWART, admitted *pro hac vice*
    200 Park Avenue
19  New York, NY 10166
    Telephone: (212) 351-4000
20  Facsimile: (212) 351-4035

21

22  Attorneys for Defendant/Third-Party Plaintiff
    THE BANK OF NEW YORK MELLON
23

24

25

26

27

28